Present:  All the Justices

STEVE ROACH

v.  Record No. 951416    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                     March 1, 1996
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF GREENE COUNTY
Lloyd C. Sullenberger, Judge


In this appeal, we review a capital murder conviction and a death sentence imposed upon Steve Edward Roach for the murder of Mary Ann Hughes, his 70-year-old neighbor.[1]

## I. PROCEEDINGS

Juvenile petitions were issued against Roach, who was 17 years old at the time of these offenses, charging him with capital murder, use of a firearm in the commission of murder, and robbery.  The Commonwealth gave notice of intent to try Roach as an adult and a transfer hearing was conducted in the Greene County Juvenile and Domestic Relations District Court (the juvenile court).  Finding probable cause to believe that Roach committed the crimes, the juvenile court advised the Commonwealth's Attorney that he could seek indictments against Roach before a grand jury.  The circuit court then reviewed the transfer order under Code § 16.1-269 and found probable cause to believe that Roach committed all three offenses.

Roach was tried as an adult on indictments charging (1) capital murder of Mary Ann Hughes in the commission of robbery

_____

[1]Roach has not appealed his convictions of robbery and use of a firearm in the commission of murder.

while armed with a deadly weapon, in violation of Code § 18.2-31(4); (2) use of a firearm in the commission of murder, in violation of Code § 18.2-53.1; and (3) robbery by violence to the person of Mary Ann Hughes, in violation of Code § 18.2-58. At the first stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4(A), Roach was found guilty as charged in all three indictments.[2]

At the penalty phase of the capital murder trial, the court struck the evidence as to the "vileness" predicate of a capital sentence, but submitted the case to the jury upon the "future dangerousness" predicate. The jury found that the "future dangerousness" predicate was satisfied and unanimously fixed Roach's punishment at death.

Upon review of victim impact statements and a probation officer's report, and after conducting a sentencing hearing, the trial court sentenced Roach in accord with the jury verdict on the capital murder conviction. Further, the court sentenced Roach to three years imprisonment for the use of a firearm in the commission of a murder and to life imprisonment for robbery.

## II.  THE EVIDENCE

### Guilt Phase

---

[2]Since Roach was a juvenile at the time these offenses were committed, the jury did not fix punishment on the noncapital charges.  See Code § 16.1-272.

We will review the evidence in the light most favorable to the Commonwealth, the prevailing party below. Cheng v. Commonwealth, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990). On the evening of December 3, 1993, Mary Ann Hughes was shot and killed in her home about five miles west of Stanardsville. Hughes was standing at her open front door when she was shot. Her body was discovered the next day.

The cause of death was a single shotgun wound to the chest, which caused injury to an artery, the chest wall, and the right lung. Dr. Deborah Kay, the medical examiner who performed the autopsy on Hughes, recovered shotgun pellets and wadding from Hughes's chest. The pellets and wadding were identified as number eight shot from a 12 gauge Remington shot shell case.

The day before the killing, Roach brought a 12 gauge shotgun to a neighbor's house, and he and two friends engaged in shooting the gun in the back yard using number eight shot. The police later recovered from the neighbor's back yard number eight shot that was consistent with a 12 gauge Remington shell case.

Roach and Hughes were also neighbors. Roach helped Hughes with household chores and also spent a great deal of time visiting her. The evidence showed that Roach was familiar with Hughes's habits, and that Hughes customarily deposited her social security check in the bank within the first few days of each month.

On the night she was killed, Hughes's purse, containing a

Discover credit card and approximately sixty dollars in cash, was taken from her home. Hughes owned a 1981 Buick Regal, which also was taken.

In the early morning hours of December 4, 1993, Gregory Lee Giuriceo, Jr., a deputy sheriff for Nottoway County, noticed a Buick Regal parked in a parking lot of a shopping center in Blackstone. Roach was identified by Giuriceo as the operator of the car. After leaving the parking lot, Giuriceo determined that the automobile was registered to Hughes.

Later in the morning of December 4, 1993, Roach attempted to use Hughes's Discover bank card at an automated teller machine in Louisburg, North Carolina. A video tape from the machine showed Roach attempting to withdraw cash from Hughes's account.

On December 5, 1993, Trooper David F. Chavis of the South Carolina Highway Patrol observed a 1981 Buick Regal automobile with Virginia plates which was being driven at 69 miles per hour in a 55 mile per hour zone. He activated the lights on his patrol car and proceeded behind the Buick. The driver of the Buick drove the automobile over to the left shoulder of the road, got out of the car, ran into the woods at the side of the road, and escaped. The driver was wearing clothes which matched the description of the clothes Roach had been seen wearing for the previous two days.

Trooper Chavis impounded the vehicle and traced its ownership to Hughes. Items retrieved from the automobile

included Hughes's purse, a blue jacket, a number eight load shotgun shell, and a plastic bag from a Winn-Dixie grocery store. Mahlon Jones, a fingerprint expert employed by the Commonwealth's Division of Forensic Science, identified a latent palm print from the plastic bag as matching Roach's left palm print. In addition, latent fingerprints were recovered from the automobile which matched Roach's fingerprints.

Roach made several telephone calls to his aunt, Annie Betty Dean, while he was in North Carolina and South Carolina. During those telephone conversations, she asked him to "come home and give [himself] up." On December 6, 1993, Roach contacted Sheriff William L. Morris and arranged to come that day with his father to the Sheriff's Department for questioning.

At the Sheriff's Department, Morris advised Roach of his <u>Miranda</u> rights in the presence of Roach's father. Roach waived his rights, and both he and his father signed the waiver form. Sheriff Morris then questioned Roach out of his father's presence. Clarence Roberts, an acquaintance of the Roach family and an employee of the Department of Alcoholic Beverage Control, was present with Morris during the interview.

At first, Roach told Morris that he and a friend, Scott Shifflett, went to Hughes's house on the evening of December 3, 1993. Roach said that Shifflett left the 12 gauge shotgun at the door, and that they entered the house and played Yahtzee with Hughes. Roach recounted that Shifflett then took the keys to the

Buick Regal and the two began to leave the house. Roach said that, after he left, Shifflett ran back to the front door, fired one shot, and ran back to the Buick with Hughes's purse. According to Roach, Shifflett said that he had "fired through the roof to scare her."

Roach stated that Shifflett then jumped into the driver's seat of the Buick and they drove to North Carolina. He said that Shifflett must have tried to use Hughes's Discover credit card while Roach was in a Winn-Dixie store making some purchases. Roach also stated that he and Shifflett abandoned Hughes's vehicle in North Carolina.

During the questioning, Morris related to Roach certain evidence that had already been discovered, stating, "[W]ith all these discrepancies in the story, . . . I'm finding it really a little difficult to believe some of the things you're telling me." Roberts then told Roach that he knew Roach was lying and that "this is a heavy burden to carry on your shoulders for the rest of your life, if you committed this act you need to tell Sheriff Morris and you need to unburden yourself."

> Roach then told Morris,
> I went over there and saw her counting the money and as
> I was leaving, I had the shotgun laying at the door and
> I shot her, took the money, the car and left, went to
> North Carolina. And I cashed -- I tried to use -- use
> the credit card but -- about four times[,] but it
> wouldn't work.

When asked where he shot Hughes, he answered, "In the chest."

At trial, Roach offered evidence that there was no gunshot

residue on his hands or clothes when he was arrested. He also presented evidence that no footprints at the scene of the crime matched the shoes he was wearing on December 3, 1993. In addition, Barbara Llewellyn, an expert employed by the Division of Forensic Science in the analysis of blood and body fluid, testified that, when Roach was arrested, he had no blood on his clothing, except a "very light stain" on his shirt, despite the fact that the fatal wound perforated one of Hughes's arteries and the pattern of blood splatters indicated that the person who had fired the gun was standing within five feet of Hughes.

### Penalty Phase

During the penalty phase of the trial, the Commonwealth put on evidence of Roach's prior juvenile convictions. Roach had been convicted twice of grand larceny of an automobile. He committed the first larceny in May 1993 and the second in August 1993. In connection with the first automobile larceny, Roach was convicted of reckless driving and failure to stop for a police officer.

In June 1993, Roach was convicted of breaking and entering a residential dwelling and of grand larceny arising out of the burglary. Roach gained entry to the home by breaking a window. He then ransacked the house and stole a .357 magnum pistol.

In August 1993, Roach was sentenced to supervised probation and house arrest under the supervision of his parents at all times. He violated the conditions of this probation when he left

the family home and carried a weapon.

When Roach was placed on probation in August 1993, a psychological evaluation was ordered.  The psychologist recommended that Roach and his family attend family counseling and that Roach increase his level of academic attainment.  Roach had stopped attending school in 1991 when he was 14 years old.

According to John T. Frey, Roach's probation officer, Roach and his family attended counseling sessions at the regional counseling center prior to December 1993.  Roach also enrolled in G.E.D. classes in the adult education program offered by Greene County.

Shirley Ann Roach, Roach's mother, testified that she and Roach's father had separated and reconciled their marriage four times during Roach's childhood.  She testified that she and her husband requested that Roach be released from compulsory education at age 14 because he was needed around the house to do chores and to care for his brothers.  She also stated that she did not realize that possessing a weapon violated the terms of Roach's probation because the probation papers did not explicitly state this fact.

John Roach, Roach's father, testified that he was frequently absent from home.  He also suffered from significant health problems.  When Steve Roach was six years old, John Roach sustained a shotgun injury which required him to remain in the hospital for six months.  While being treated for the gunshot

wound, he contracted Hepatitis C from a blood transfusion. The medication he received for this condition caused mood changes.

John Roach testified that, when his wife left him, life "got worse" for his children. He began drinking heavily and brought young girls into the home in order to make his wife jealous. He stated that the children were present when this occurred and that they did not receive parental supervision. He also stated that Steve Roach had free access to all the guns in the house.

Several family friends and relatives testified on Steve Roach's behalf. Clarence Roberts testified that Roach had performed numerous "odd jobs" for him, and that Roach was "an excellent employee." Tammy Estes, Roach's half sister, stated that Roach often helped his neighbors, including Hughes, cut firewood, cook, and clean their laundry.

Wendell Lamb, the pastor of Roach's church, testified that Roach volunteered his time to help paint and remodel the church and to work at a camp for children in the George Washington National Forest. Lamb conceded that, while Roach was doing volunteer work for the church, he was accused of stealing a watch. Roach and the owner of the watch resolved the dispute privately.

Roach testified on his own behalf. He stated that, shortly after 9:00 p.m. on December 3, 1993, he walked to Hughes's house with his shotgun. When she opened the door, he fired once, walked past her body, and took her purse and the keys to her car.

He stated that he then drove to North Carolina and attempted to use her Discover credit card to get cash.  Roach testified that he did not know Hughes had died until he spoke by telephone with his aunt.

Roach also testified that, when he went to Hughes's house, he knew she had just received her social security check, knew the location of her purse, and intended to steal both items.  However, he stated that he did not intend to hurt her, and that he could not explain "what went . . . through [his] mind."  He also testified that he was sorry he had killed Hughes, stating, "I wish I could bring her back."

Dr. Gary Lee Hawk, a forensic psychologist appointed by the court, testified concerning his evaluation of Roach.  Hawk met with Roach on six different occasions and spoke with Roach's parents and other family members.  Hawk determined that Roach was of average intelligence and had mild depressive symptoms.  Hawk found no indication that Roach had suffered any brain injury.  He also found no evidence that Roach suffered from any serious mental illness.

Hawk testified that Roach lied to him about a number of things and gave him four different versions of what happened on December 3, 1993.  He also stated that Roach was "particularly immature" for his age.  Hawk concluded that Roach had poor "impulse control" and "did not show very good ability in many situations to control his emotions or behavior like seventeen-

year-old or eighteen-year-old individuals should do."

Hawk related Roach's immaturity to the fact that he did not get the guidance and the structure that children need to mature. Hawk further stated that Roach's probation violation for carrying a weapon was a result of this lack of structure and supervision. He also testified that there was no pattern of violent behavior in Roach's life.

Hawk stated that, in psychological terms, Roach's act of killing a friend arose from the fact that "[a]dolescents in conflict, adolescents in turmoil frequently express extremely strong and angry emotions with very little provocation . . . If it's an immature adolescent, that sort of reaction is more extreme." Hawk stated that "displacement of emotion" occurs when one person or situation makes a person angry, but the feelings and anger are expressed toward someone else.

Hawk stated, "Knowing that this was a woman that [Roach] was close to, and knowing that there was not an existing pattern of this sort of violent offending, and considering what he told me, it's dynamics like that [which] would explain [the murder] in psychological terms." In addition, Hawk testified that, "[i]n terms of normal development," impulsiveness diminishes and "doesn't cause problems for the person."

### III. ARGUMENTS WAIVED

Because Roach did not address in his briefs assignments of

error 15(c), 16(f), and 16(h), he is deemed to have waived them.[3]
Rule 5:27. Also, since Roach did not ask the trial court to strike certain prospective jurors for cause, after they heard another prospective juror state a belief that Roach was guilty, he has waived this objection to the empanelment of those jurors. Rule 5:25.[4]

## IV. ISSUES PREVIOUSLY DECIDED

Roach has advanced a number of arguments that we have rejected in previous decisions. Finding no reason to modify our previously expressed views, we will reaffirm our earlier

---

[3] These assignments of error are:

15(c): Virginia's juvenile transfer statute is unconstitutional as applied.

16(f): The trial court erred in overruling the motion to prohibit the imposition of the death penalty and to strike the capital murder charge on the grounds that the post-sentence report infringes upon the defendant's rights to due process, to confront his accusers, to be free from cruel and unusual punishment, and to effective assistance of counsel.

16(h): Virginia's death penalty statutes as administered deny capital defendants effective assistance of counsel.

[4]Roach has also argued that he received ineffective assistance of counsel during voir dire based on this occurrence. However, such a claim is not reviewable on direct appeal. Walker v. Mitchell, 224 Va. 568, 570, 299 S.E.2d 698, 699 (1983); Browning v. Commonwealth, 19 Va. App. 295, 297, n.2, 452 S.E.2d 360, 362, n.2 (1994); see Acts 1990, ch.74.

decisions and reject the following contentions:

A.  The denial of a jury instruction that Roach would be required to serve a minimum of twenty-five years before becoming eligible for parole.  In Joseph v. Commonwealth, 249 Va. 78, 84, 452 S.E.2d 862, 866, cert. denied, ___ U.S. ___, 116 S.Ct. 204 (1995), we held that such an instruction is not available to defendants who will be eligible for parole at a future date.

B.  The trial court's refusal to limit evidence of juvenile and unadjudicated crimes as background evidence at sentencing. Rejected in Beaver v. Commonwealth, 232 Va. 521, 528-29, 352 S.E.2d 342, 346-47, cert. denied, 483 U.S. 1033 (1987).

C.  The Virginia transfer statute does not provide individualized consideration of a juvenile's moral culpability and maturity.  Rejected in Wright v. Commonwealth, 245 Va. 177, 182-83, 427 S.E.2d 379, 383-84 (1993), vacated and remanded, ___ U.S. ___, 114 S.Ct. 2701 (1994), aff'd, 248 Va. 485, 450 S.E.2d 361 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1800 (1995); Thomas v. Commonwealth, 244 Va. 1, 7, 419 S.E.2d 606, 609, cert. denied, 506 U.S. 958 (1992).

D.  The sentencing verdict form prescribed by Code § 19.2-264(D) renders the jury's option of imposing a life sentence unconstitutionally vague and obscures mitigation evidence.  We rejected these contentions in Stockton v. Commonwealth, 241 Va. 192, 215, 402 S.E.2d 196, 209, cert. denied, 502 U.S. 902 (1991), and in LeVasseur v. Commonwealth,

225 Va. 564, 594-95, 304 S.E.2d 644, 661 (1983), cert. denied, 464 U.S. 1063 (1984).  Thus, we find no error in the trial court's refusal to substitute Roach's proposed verdict form for the statutory sentencing verdict form.

E.  The death penalty statutes do not give meaningful guidance to jurors that they may impose a death sentence only if they determine beyond a reasonable doubt that aggravating circumstances outweigh mitigating ones.  Rejected in Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 674-75, cert. denied, ___ U.S. ___, 115 S.Ct. 442 (1994); Watkins v. Commonwealth, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), cert. denied, 475 U.S. 1099 (1986).

F.  Code § 19.2-264.4(C) violates the defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution because the jury may find future dangerousness based upon unadjudicated crimes.  Rejected in Evans v. Commonwealth, 222 Va. 766, 770, 284 S.E.2d 816, 817-18 (1981), cert. denied, 455 U.S. 1038 (1982); see also Watkins v. Commonwealth, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), cert. denied, 494 U.S. 1074 (1990).

G.  The capital murder and death penalty statutes as administered are unconstitutional for every reason cited by the majority in Furman v. Georgia, 408 U.S. 238 (1972).  In Fitzgerald v. Commonwealth, 223 Va. 615, 635-36, 292 S.E.2d 798, 810 (1982), cert. denied, 459 U.S. 1228 (1983), we held that the

- 14 -

Virginia capital murder statutes eliminated the constitutional violations identified in Furman. Further, in Clark v. Commonwealth, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), cert. denied, 444 U.S. 1049 (1980), we rejected the argument that the Virginia death penalty sentencing statutes violated the restrictions of the Furman holding.

H. The death penalty statutes deny defendants meaningful appellate review and deny defendants equal protection of the law and due process of law because of the single tier of appellate review of death sentences. Rejected in Payne v. Commonwealth, 233 Va. 460, 473-74, 357 S.E.2d 500, 508, cert. denied, 484 U.S. 933 (1987).

V. PRETRIAL MATTERS

A. Juvenile Court Issues

Roach contends that the statutes defining the authority of juvenile court intake officers violate the separation of powers clauses of the Virginia Constitution, Art. I, § 5 and Art. III, § 1. He asserts that, since intake officers are employees of the Department of Youth and Family Services, an executive agency, they are constitutionally prohibited from exercising the judicial powers of determining probable cause, issuing petitions or criminal warrants, or issuing detention orders.

Initially, we note that statutes are presumed to comply with the Virginia and United States Constitutions and will be declared unconstitutional only when their provisions plainly violate

either document.  Etheridge v. Medical Ctr. Hosp., 237 Va. 87, 94, 376 S.E.2d 525, 528 (1989).  In Winchester & Strasburg R.R. v. Commonwealth, 106 Va. 264, 55 S.E. 692 (1906), we stated that the separation of the executive, judicial, and legislative branches of government is "indispensable to public liberty."  However, we emphasized that the separation required by the Virginia Constitution is not an absolute separation.  We held that the branches of government need not "be kept wholly and entirely separate and distinct, and have no common link or dependence . . .  The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments."  Id. at 270, 55 S.E. at 694 (citations omitted).

The juvenile and domestic relations district court judges share appointment, assignment, and discharge powers over the intake officers with the Department of Youth and Family Services.  See Code §§ 16.1-233 and -235.  In filing a petition to initiate a criminal case, the intake officer makes a determination that there is probable cause to believe that a juvenile has committed a criminal offense.  See Code § 16.1-260.  However, the juvenile and domestic relations district court, not the Department of Youth and Family Services, has original jurisdiction over matters involving the delinquent juvenile.  Code § 16.1-241.  Further, the failure of an intake officer to file a petition does not divest the juvenile and domestic relations district court of

jurisdiction over the juvenile.  Code § 16.1-260(G).

Thus, juvenile intake officers do not exercise the whole power of the judiciary.  Because such officers exercise only a limited judicial function, and the juvenile and domestic relations district court retains actual control over the juveniles, we conclude that the intake officer's authority to issue criminal petitions does not violate the separation of powers guaranteed by the Virginia Constitution.

Next, Roach argues that the circuit court acquired jurisdiction to try him only for the lesser included offense of first degree murder.  He asserts that, since the juvenile court did not render a probable cause determination concerning the presence of aggravating circumstances supporting imposition of the death penalty, the circuit court did not acquire jurisdiction to impose the death penalty.  We disagree.

Before Roach could be transferred to the circuit court for trial as an adult, the juvenile court was required by former Code § 16.1-269 (now § 16.1-269.1) to determine whether there was probable cause to believe that he committed an offense which would be a felony had it been committed by an adult.  The aggravating circumstances required for imposition of the death penalty are not elements of the crime of capital murder.  They relate only to the punishment authorized after conviction of the offense.  Therefore, the juvenile court was not required to make a probable cause determination of the sufficiency of the evidence

in support of the statutory predicates for imposition of the death penalty.

B.   Bill of Particulars

Roach filed a motion for a bill of particulars.[5]  The trial

---

[5]The motion for a bill of particulars requested that the trial court enter an order directing the Commonwealth:

a)  To identify the grounds, and all of them, on which it contends that defendant is guilty of Capital Murder under Va. Code Ann. [§] 18.2-31.

b)  To identify the evidence, and all of it, upon which it intends to rely in seeking a conviction of Defendant upon the charge of Capital Murder.

c)  To identify the aggravating factors, if any, upon which it intends to rely in seeking the death penalty, should defendant be convicted of Capital Murder.

d)  If the response to (c) includes statement that Commonwealth intends to prove the "vileness" factor as set out in Va. Code Ann. § 19.2-264.4C, to identify as many of the components of the factor, torture, depravity of mind, aggravated battery on which it intends to offer evidence.

e)  If the response to (c) include statements that Commonwealth intends to prove the "vileness" factor as set out in Va. Code Ann. § 19.2-264.4C, to identify every narrowing construction of that factor on which it intends to offer evidence.

f)  If the response to (c) include statements that the Commonwealth intends to use to prove the "future dangerousness" factor as set out in Va. Code Ann. § 19.2-264.4C, to identify any unadjudicated allegations of misconduct by defendant upon which it intends to offer evidence and any circumstances of the offense it contends are relevant to proof of the factor.

g)  To identify the evidence, and all of it, on which it intends to rely in support of the aggravating factors identified, and all other evidence which it intends to introduce in support of its contention that

court granted the motion with respect to paragraph (f) involving unadjudicated allegations of misconduct and "any circumstances of the offense [the Commonwealth] contends are relevant to proof of the [future dangerousness] factor."  The court denied the balance of the motion.  Roach argues that the trial court's denial of the remaining parts of the motion constitutes error based on the gravity of the penalty sought.  We disagree.

A defendant is not entitled to a bill of particulars as a matter of right.  Code § 19.2-230 provides that a court "may direct the filing of a bill of particulars."  Thus, the trial court has discretion whether to require the Commonwealth to file a bill of particulars.  Quesinberry v. Commonwealth, 241 Va. 364, 372, 402 S.E.2d 218, 223, cert. denied, 502 U.S. 834 (1991).

If the indictment gives a defendant sufficient "notice of the nature and character of the offense charged so he can make his defense," no bill of particulars is required.[6]  Wilder v.

(..continued)
death is the appropriate punishment for this Defendant.

[6]The capital murder indictment alleged that "[o]n or about December 3, 1993, STEVE EDWARD ROACH . . . did, in the County of Greene, unlawfully and feloniously commit capital murder by the willful, deliberate, and premeditated killing of Mary Ann Hughes in the commission of robbery while armed with a deadly weapon, which offense is punishable as a felony in violation of Section 18.2-31(4) of the Code of Virginia."

- 19 -

Commonwealth, 217 Va. 145, 147, 225 S.E.2d 411, 413 (1976). The indictment in this case met that standard. Therefore, the trial court did not abuse its discretion in denying the balance of Roach's motion. See Strickler v. Commonwealth, 241 Va. 482, 490, 404 S.E.2d 227, 233, cert. denied, 502 U.S. 944 (1991).

C.    Voluntariness of Roach's Confession

Roach argues that the trial court erred in refusing to suppress his confession as being involuntary "for purposes of exposing him to the death penalty." Roach asserts that his waiver of Miranda rights was "questionable," and that he made his statements based on the mistaken belief that he would receive the benefit of a lesser penalty in exchange for admitting that he had shot Hughes. He contends that the statements were induced by Sheriff Morris's allegedly misleading remarks such as "the truth is so very, very important to you, to us and to yourself."

In assessing the voluntariness of Roach's statement, we apply a well-established standard of review. In Gray v. Commonwealth, 233 Va. 313, 356 S.E.2d 157, cert. denied, 484 U.S. 873 (1987), we said:

A defendant's waiver of his Miranda rights is valid only if the waiver is made knowingly, voluntarily and intelligently, Miranda, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. See Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. Id. at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically

> impaired." Schneckloth v. Bustamonte, 412 U.S. 218,
> 225 (1973). In determining whether a defendant's will
> has been overborne, courts look to "the totality of all
> the surrounding circumstances," id. at 226, including
> the defendant's background and experience and the
> conduct of the police, Correll v. Commonwealth, 232 Va.
> 454, 464, 352 S.E.2d 352, 357 (1987); Stockton, 227 Va.
> at 140, 314 S.E.2d at 381.

Id. at 324, 356 S.E.2d at 163.

The record shows that Roach was of average intelligence, and that he telephoned Sheriff Morris to initiate the questioning. Prior to the interrogation, Morris advised Roach and Roach's father of Roach's Miranda rights. Although John Roach was not present during the interrogation, both he and Steve Roach indicated that they understood the Miranda rights and they signed the waiver forms. During the interrogation, there was no mention of the death penalty at any time. Roach stated to Morris that he was making the statements of his own free will, without pressure of threats or promises.

We also consider the factual findings made by the trial court. The trial court found that Roach "was not intoxicated [and] understood his surroundings and the questions asked of him." The court found that the interrogation atmosphere was not coercive and that Roach had not been threatened in any way. The court found that the entreaties to Roach to tell the truth did not overbear Roach's will. Because these factual findings are supported by the record, we accord them substantial weight in our determination whether Roach's statements were voluntary. Miller v. Fenton, 474 U.S. 104, 112 (1985).

- 21 -

Based on the above evidence and findings, we hold that Roach's statements were voluntary.  No threats or promises were made to induce the confession and there is no evidence indicating that the confession was coerced.  Instead, the evidence demonstrates that the statements were the product of Roach's free and unconstrained choice.

D.    Venue

Roach filed a motion for a change of venue on the basis that the crime, a "high profile" murder in a rural setting, rendered the trial court unable to empanel an impartial jury.  The trial court took the motion under advisement and, after the jury was empaneled, overruled the motion.

Roach argues that the trial court erred in denying his motion for a change of venue because the pretrial publicity was widespread and prejudicial.  He notes that over 50 percent of the jury pool was familiar with Roach, the victim, members of her family, the Commonwealth's Attorney, or witnesses.  The trial court observed, however, that although 31 jurors were stricken for cause, "a large number of those were stricken because of their view concerning the death penalty and not because of any evidence of bias for or against the accused or the prosecution."

A presumption exists that a defendant can receive a fair trial in the jurisdiction in which the offense occurred.  Stockton, 227 Va. at 137, 314 S.E.2d at 380.  In order to overcome this presumption, a defendant must demonstrate that the

citizens of the jurisdiction feel such prejudice against the defendant as is reasonably certain to prevent a fair trial. Id. Further, the decision whether to grant a change of venue lies within the sound discretion of the trial court. George v. Commonwealth, 242 Va. 264, 274, 411 S.E.2d 12, 18, cert. denied, 503 U.S. 973 (1992).

The fact that there have been media reports about the accused and the crime does not necessarily require a change of venue. Buchanan v. Commonwealth, 238 Va. 389, 407, 384 S.E.2d 757, 767-68 (1989), cert. denied, 493 U.S. 1063 (1990). Another significant factor the trial court must consider is "the difficulty encountered in selecting a jury." Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992), cert. denied, 507 U.S. 1043 (1993).

Roach did not overcome the presumption that he could receive a fair trial in Greene County. He concedes that only six members of the jury pool were so prejudiced by media coverage that they could not give him a fair trial. Given the relative ease with which the jury was selected, we hold that the trial court did not abuse its discretion in denying Roach's motion for a change of venue.

E. Jury Selection

Roach next argues that the trial court erred in refusing to strike for cause juror Breeden. During voir dire, juror Breeden testified that Daniel Bouton, the Commonwealth's Attorney,

formerly had represented him in a legal matter.  Although Bouton was not representing Breeden in any matter at the time of trial, Breeden stated that he would regard Bouton as his personal attorney.  Breeden also testified that his former connection with Bouton would not affect his ability to be impartial.  Roach argues that this relationship presented an inherent conflict, and that Breeden was more likely to be influenced by Bouton's closing argument because he was accustomed to looking to Bouton for legal guidance.

The trial court's decision whether to strike a juror for cause is a matter submitted to its discretion and will not be disturbed on appeal unless the refusal constitutes manifest error.  Stockton, 241 Va. at 200, 402 S.E.2d at 200.  Further, in Calhoun v. Commonwealth, 226 Va. 256, 263, 307 S.E.2d 896, 900 (1983), we refused to adopt a per se rule disqualifying a juror solely because the juror had been represented by the Commonwealth's Attorney at some time in the past.

In the present case, the trial court had the opportunity to observe Breeden's demeanor when evaluating his statement that his ability to be impartial would not be affected by his former association with Bouton.  Nothing in the record suggests that the trial court abused its discretion in accepting Breeden's statement that he could be impartial in the trial of the case.  Thus, we find no merit in Roach's argument.[7]

---

[7]We also find no merit in Roach's claim that his Fourteenth

VI.  GUILT PHASE ISSUES

Roach argues that the trial court erred in refusing to set aside the verdict of capital murder based on the alleged absence of evidence corroborating his confession that he was the "triggerman."  Roach asserts that his confession was inadequate as a matter of law to establish that he was the immediate perpetrator of the killing.

In addition, Roach argues that the trial court erred in failing to instruct the jury that the "triggerman" portion of his confession had to be corroborated before he could be convicted of capital murder.  He also assigns as error the court's refusal of an instruction defining a principal in the second degree, as well as its refusal of an instruction that only the immediate perpetrator of a killing can be convicted of capital murder.  We disagree with the above assertions.

The Commonwealth need not corroborate an entire confession, but it must corroborate the elements of the corpus delicti. Watkins, 238 Va. at 348, 385 S.E.2d at 54.  In the present case, the Commonwealth met its burden of corroborating the corpus delicti of capital murder.

The corpus delicti of a homicide consists of "proof of the
(..continued)
Amendment rights were violated by the trial court's refusal to strike Breeden for cause.  The record before us offers no support for such a claim.

victim's death from the criminal act or agency of another person." Swann v. Commonwealth, 247 Va. 222, 236, 441 S.E.2d 195, 205, cert. denied, ___ U.S. ___, 115 S.Ct. 234 (1994). The testimony of Dr. Kay, the medical examiner, established that Hughes died from a shotgun wound to the chest. There was no evidence that the wound was self-inflicted. Further, the Commonwealth produced evidence which tended to corroborate that Roach was the "triggerman" in the killing.

The Commonwealth showed that Roach owned a 12 gauge shotgun and that he had shot number eight shot from it the day before the murder. The shot and wadding retrieved from Hughes's chest were consistent with the type used in Roach's weapon. The Commonwealth also produced evidence taken from Hughes's car including a number eight shot shell casing, as well as latent fingerprints which matched Roach's fingerprints.

The corpus delicti of robbery, the predicate offense of this capital murder charge, was also corroborated by evidence independent of Roach's confession. The autopsy report revealed evidence of violent force used on Hughes, and the videotape from the automatic teller machine showed Roach attempting to use Hughes's credit card. Further, as stated above, latent fingerprints matching Roach's fingerprints were found in Hughes's vehicle, which was taken from the murder scene.

Since the Commonwealth sufficiently corroborated the corpus delicti of capital murder, the trial court did not err in denying

Roach's motion to set aside the verdict.  Likewise, the court did not err in failing to instruct the jury that Roach's confession that he was the "triggerman" must be corroborated since the court had already correctly determined, as a matter of law, that the confession was sufficiently corroborated to go to the jury.  See Watkins, 238 Va. at 350-51, 385 S.E.2d at 55.

Finally, there was no error in the trial court's refusal to give a jury instruction that only the immediate perpetrator of the killing can be found guilty of capital murder.  There was no evidence that Roach acted with an accomplice other than the first version of his confession, which he later recanted.  Also, since his theory that another person was the triggerman was unsupported by the evidence, Roach was not entitled to an instruction defining a principal in the second degree.  See Eaton v. Commonwealth, 240 Va. 236, 255, 397 S.E.2d 385, 397 (1990), cert. denied, 502 U.S. 824 (1991).

VII.  PENALTY PHASE ISSUES

Juror Question

Roach contends that the jury prematurely began deliberations during the penalty phase of the trial.  In support of his claim, he notes that, after the jury had been instructed but before it began deliberating, one juror asked the trial court, "Does life in prison mean with no chance of parole or truly life in prison, or is he eligible for parole?"

At this point, Roach's counsel informed the trial court that

"unless the possibility can be excluded that this question originated solely with one juror, the defense would respectfully move for a mistrial." The trial court declined to question the jury on the matter, but gave the jury an additional instruction stating, "Having found the defendant guilty, you should impose such punishment as you feel is just under the evidence and within the instructions of the Court. You are not to concern yourself with what may happen afterwards."

We find no merit in Roach's claim. The question posed by the individual juror does not indicate that the jury had begun deliberating Roach's penalty. Thus, the trial court did not abuse its discretion in denying the mistrial motion.

### Jury Instructions

Roach argues that the trial court erred in refusing to instruct the jury on the meaning of the word "probability," in the context of the "future dangerousness" provision of Code § 19.2-264.2. We disagree. In Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684, vacated on other grounds, 513 U.S. ___, 115 S.Ct. 307 (1994), we held that the word "probability," as it appears in the statutory context of the "future dangerousness" predicate, is not ambiguous. Therefore, Roach was not entitled to a jury instruction defining that word. See Lovisi v. Commonwealth, 212 Va. 848, 850, 188 S.E.2d 206, 207, 208 (1972).

Roach next asserts that he was denied his Fourteenth

Amendment right of equal protection, because he was refused an instruction informing the jury that, if he received a life sentence on the capital murder charge, he would not be eligible for parole for 25 years. In contrast, Roach argues, certain "adjudicated recidivists" are entitled to an instruction informing the jury that they would be ineligible for parole if given a life sentence for the same offense. See Simmons v. South Carolina, 512 U.S. 2198 (1994).

As stated above, in applying the rule of Simmons, this Court has held that a defendant charged with capital murder is entitled to an instruction regarding parole eligibility only when (1) the defendant's future dangerousness is in issue, and (2) the defendant is ineligible for parole at the time he is sentenced on the capital murder charge. Wright, 248 Va. at 487, 450 S.E.2d at 362. Since Roach does not contend that he was ineligible for parole when he was sentenced, he was not entitled to an instruction regarding parole eligibility. Moreover, Roach has not suffered a denial of equal protection from the refusal of such an instruction, because a non-suspect classification is involved here and that classification "rationally advances a reasonable and identifiable governmental objective." Schweiker v. Wilson, 450 U.S. 221, 235 (1981); see Evans, 228 Va. at 481, 323 S.E.2d at 122.

When a "recidivist" is ineligible for parole at the time of sentencing on a capital murder charge, this fact is relevant to

the issue whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society."  See Code § 19.2-264.2(1).  In contrast, the fact that Roach would be eligible for parole in 25 years is not probative of this issue.  This fact could do nothing more than invite the jury to speculate on the effect incarceration might have on Roach.  The elimination of such improper speculation provides a rational basis supporting the denial of the requested instruction.  Thus, Roach's equal protection claim fails.  See Schweiker at 235.

### Standard of Proof for Future Dangerousness

Roach argues that, because this Court has never reversed a death sentence based on insufficiency of evidence of "future dangerousness," "Virginia cases articulate no standards to confine the reach of" that sentencing factor.  Roach contends that such standards must be articulated.

We disagree, because the conclusion Roach urges ignores the central purpose of Code § 19.2-264.2, that of individualized consideration of the defendant and the crime committed.  Under the direction of Code § 19.2-264.2, the trier of fact may not impose the death penalty unless it finds "future dangerousness" beyond a reasonable doubt, upon consideration of all relevant evidence of the defendant's background, as well as the crime for which the defendant is being sentenced.  This individualized consideration necessarily precludes the articulation of precise

requirements for a finding of "future dangerousness."  Moreover, a defendant is protected from an unsupported finding of "future dangerousness" by the right to appellate review of the sufficiency of the evidence in support of that finding.

Sufficiency of Evidence

of "Future Dangerousness"

Under Code § 19.2-264.2, the death penalty may not be imposed unless the trier of fact shall find one or both of two aggravating factors we have referred to as "future dangerousness" and "vileness."  Yeatts v. Commonwealth, 242 Va. 121, 139, 410 S.E.2d 254, 265 (1991), cert. denied, 503 U.S. 946 (1992).  In the present case, the jury found "future dangerousness," meaning "there is a probability that [Roach] would commit criminal acts of violence that would constitute a continuing serious threat to society."  Code § 19.2-264.2.

Roach argues that the Commonwealth failed to produce sufficient proof of his "future dangerousness."  He first emphasizes that the only expert psychological testimony at the penalty phase was given by Dr. Hawk, who stated that there was no pattern of violent behavior in Roach's life.  Although he concedes that "[a]ll of [his] misconduct arguably involved potential for violence," Roach asserts that the Commonwealth never introduced evidence of any actual or threatened violence in his past behavior.  He also notes that his misconduct occurred only during the period of his family's "disintegration."

- 31 -

Further, given his difficult family background and the fact that he had only one probation violation prior to December 3, 1993, Roach asserts that the jury's finding of "future dangerousness" is unsupported by the evidence. We disagree.

The evidence in the penalty phase showed that, within approximately a seven-month period prior to Roach's murder of Hughes, he had broken and entered a private residence, stolen a .357 Magnum pistol from that dwelling, committed two automobile larcenies, and violated a condition of his probation.

> As this Court emphasized in <u>Yeatts</u>,
> Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation - the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.

242 Va. at 140, 410 S.E.2d at 266 (citations omitted). Thus, Roach's commission of burglary, and his theft of a .357 Magnum pistol during the burglary, were relevant evidence in determining his "future dangerousness."[8] <u>See</u> <u>id</u>.

The jury also heard evidence from John Frey, Roach's probation officer, that Roach violated his probation in carrying a shotgun. Violent behavior arose from this probation violation

---

[8]The fact that the dwelling Roach broke and entered was unoccupied at the time of the offense is a fortuitous circumstance that does not affect our analysis here.

when Roach used the shotgun to kill Mrs. Hughes.  Therefore, both the fact of the violation and its particular nature were relevant evidence in the jury's determination of "future dangerousness."

Most significantly, this Court has recognized that the facts and circumstances surrounding the capital murder alone may be sufficient to support a finding of "future dangerousness."  See Murphy v. Commonwealth, 246 Va. 136, 145, 431 S.E.2d 48, 53, cert. denied, 510 U.S. ___, 114 S.Ct. 336 (1993).  Here, Roach killed a defenseless, 70-year-old neighbor because he wanted her money.  He admitted that Mrs. Hughes had always been kind to him.  Yet, after shooting her at point-blank range, he walked past her body, robbed her of her money and car keys, and left her lying on the floor.

From this evidence, the jury was entitled to conclude that Roach placed little value on human life and was willing to kill even a defenseless friend in order not to be identified as the perpetrator of a robbery.  Given Roach's escalating pattern of criminal behavior culminating in the murder of Mrs. Hughes, the jury had sufficient evidence from which to find, beyond a reasonable doubt, that there was a probability that Roach would commit criminal acts of violence that would constitute a continuing serious threat to society.

Our conclusion in this regard is not altered by Dr. Hawk's testimony.  Although he testified that Roach had no pattern of violent behavior in his life, the jury was entitled to weigh this

opinion in conjunction with all the evidence of Roach's criminal behavior, including the facts and circumstances surrounding his robbery and murder of Mrs. Hughes.

Roach also argues that the "trial court erred [by] finding that no good cause had been shown to set aside the sentence of death and impose a sentence of imprisonment for life." In reviewing the record pursuant to Code § 19.2-264.5, the trial court is vested with discretion, upon good cause shown, to set aside the sentence of death. Here, the record shows that the trial court reviewed all evidence presented in both mitigation and aggravation of the offense. Based on the evidence presented, we cannot conclude that the trial court erred in finding an absence of "good cause shown" to set aside the jury verdict of death and to impose a sentence of life imprisonment.

### VIII. SENTENCE REVIEW

Under Code § 17-110.1(C)(1) and (2), we are required to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

A.  Passion and Prejudice

Roach contends that the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factor. In support of his argument, he restates several of the errors

assigned above.  Since we have found no error in the trial court's rulings, we reject this argument.  See Pope v. Commonwealth, 234 Va. 114, 127, 360 S.E.2d 352, 360 (1987), cert. denied, 485 U.S. 1015 (1988); Wise v. Commonwealth, 230 Va. 322, 335, 337 S.E.2d 715, 723 (1985), cert. denied, 475 U.S. 1112 (1986).  Additionally, our independent review of the entire record fails to disclose that the jury's death sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor."  Code § 17-110.1(C).

B.    Excessiveness and Proportionality

Roach contends that the death sentence is excessive and disproportionate to those imposed in similar cases.  He argues that comparable death sentence cases involve "fact patterns more aggravated as to (1) surrounding circumstances of the offense, (2) age and background of the defendant and (3) unrebutted defense evidence offered in mitigation."  With regard to evidence in mitigation, Roach relies primarily on Dr. Hawk's testimony and the other testimony concerning Roach's school, work, and family life.

In conducting the proportionality review, we consider "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993).  With this purpose in mind, we have

compared the record in this case with the records in other capital murder cases to determine whether the death penalty imposed here is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Code § 17-110.1(C)(2).

Here, the jury based its sentence of death only on the "future dangerousness" predicate.  Therefore, in making our proportionality determination we have given particular consideration to other capital murder cases in which robbery was the underlying felony and the death penalty was based only on the "future dangerousness" predicate.

Those cases were compiled in Yeatts, 242 Va. at 143, 410 S.E.2d at 267-68, and supplemented in Chichester v. Commonwealth, 248 Va. 311, 332-33, 448 S.E.2d 638, 652 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1134 (1995).  The following additional cases involving robberies and findings of "future dangerousness" were decided after Chichester and have been considered by us: Chandler v. Commonwealth, 249 Va. 270, 455 S.E.2d 219, cert. denied, ___ U.S. ___, 116 S.Ct. 233 (1995); Joseph, 249 Va. 78, 452 S.E.2d 862.  We have also reviewed the records in capital murder cases in which robbery was the underlying offense and a sentence of life imprisonment was imposed.

Based on this review, we conclude that, while there are exceptions, juries in this Commonwealth generally impose the death sentence for crimes comparable or similar to Roach's murder

of Mrs. Hughes.  Roach killed an elderly, defenseless friend with a shotgun at point blank range in the process of robbing her of a portion of her social security funds.  This crime, like the other death sentence crimes we have reviewed, shows extreme cruelty and lack of respect for human life.

In addition, although there was evidence in mitigation concerning Roach's status as a 17-year-old offender and his family background, the present case also involved significant evidence in aggravation of the offense.  As stated above, Roach had been found guilty of four felonies in the seven-month period prior to the commission of this offense.  Although he had been on supervised probation since August 1993, this rehabilitative measure did not deter Roach from carrying a weapon in violation of the terms of his probation.  Moreover, his use of this weapon to kill Mrs. Hughes represented the ultimate failure of rehabilitative efforts on his behalf.  Given this escalating pattern of criminal behavior, which culminated in the commission of the present offense, we conclude that the imposition of the death penalty in this case is neither excessive nor disproportionate to the penalty imposed in comparable cases.

## IX.  CONCLUSION

We find no reversible error in the issues presented here. Having reviewed Roach's sentence of death pursuant to Code § 17-110.1, we decline to commute the sentence of death. Accordingly, we will affirm the judgment of the trial court.

<u>Affirmed</u>.