COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Coleman and Senior Judge Cole
Argued at Richmond, Virginia


BILLY JOE BROWN
                                        OPINION BY
v.    Record No. 1450-96-1        JUDGE MARVIN F. COLE
                                   SEPTEMBER 22, 1998
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                    A. Bonwill Shockley, Judge

               Andrew M. Sacks (Sacks & Sacks, on briefs),
               for appellant.

               Robert H. Anderson, III, Assistant Attorney
               General (Richard Cullen, Attorney General, on
               brief), for appellee.


     In a jury trial, appellant, Billy Joe Brown, was convicted

of first degree murder, abduction and attempted rape.  On appeal,

he contends the trial court erred in denying:  (1) his motion for

appropriate relief in connection with the pretrial sponsorship by

two Virginia Beach police officers of a memorial scholarship fund

in memory of the deceased victim; (2) his motion for a mistrial

or, in the alternative, for dismissal of the jury panel after a

juror indicated that the venire, prior to trial and in the jury

assembly room, had engaged in a widespread discussion of the

guilt of the defendant; (3) his motion to strike for cause three

jurors because their responses on voir dire indicated they were

not free of exception to sit as jurors; and (4) his motion for a

change of venue.  For the reasons that follow, we affirm.

     On June 18, 1995, appellant and his codefendant, Dustin

Turner, first met the murder victim, Jennifer Evans, at a hotel bar. Turner and appellant were off-duty Navy "SEAL" trainees. In the early morning hours of June 19, 1995, appellant murdered Evans, after which, he and Turner transported and hid her body in a secluded area. Evans' body was located by authorities on June 27, 1995, eight days after she disappeared.

I. THE MEMORIAL SCHOLARSHIP FUND

Facts

Officers Louis P. Thurston, III, and Mike Carey are media relations officers with the Virginia Beach Police Department. In that capacity, they act as liaisons between the media and the police department. In July 1995, after appellant's and Turner's arrest, Thurston and Carey "approached a local bank about maintaining" funds and "accepting donations" for a memorial scholarship fund for the victim. Later, Thurston and Carey "contacted a CPA to help administer the fund." They also contacted a printer and had posters and handbills printed, which they caused to be posted and distributed in the community.

Thurston testified that the chief of police gave oral permission to create the fund. Thurston stated that the fund was not sponsored by the police department. Most of the fund work was done on the officers' own time, with only a "[v]ery minuscule" amount done while on duty. Many times they took leave of absence to work on the fund. According to Thurston, media relations officers "do not get involved in the investigation" of

a case.  Whenever they were asked about the fund, Thurston and Carey consistently stated that it was an individual effort and not a police-sponsored activity.  The bank, the CPA, and the printer volunteered their services.  Thurston averred that he and Carey made no specific mention of the defendants in communications relating to the fund; however, one communique informed the public that the fund would remain open through the trials of the men accused of Evans' death.  On two occasions, with approval by the police chief, Thurston and Carey used police stationery in releasing information about the fund.  Those communiques were released on July 13, 1995 and September 1, 1995, respectively.  The first communication was distributed more than two weeks after appellant's arrest and one week after his bond hearing.  The communications did not name appellant or Turner.  The releases discussed the purpose and status of the fund and explained how to make a contribution.

Officer Carey corroborated Thurston's testimony.  He noted that the police chief allowed Thurston and him to wear their uniforms when they initially announced the creation of the fund.  Carey explained that they "announced that [Thurston] and myself were co-chairmen and founders of the scholarship fund and it was an effort we were undertaking as two individuals."  Carey testified that approximately 1,800 posters and 11,000 handbills were distributed publicizing the fund.  In October 1995, a golf tournament was held to help supplement the scholarship fund.

Carey said that approximately 1,000 handbills were printed for the tournament. Carey recalled that, during the initial announcement of the fund, he and Thurston made clear that "it was an effort we were undertaking as two individuals." Carey identified stationery bearing the following letterhead:

The
Jennifer Lea Evans
MEMORIAL SCHOLARSHIP FUND
of Hampton Roads

Benefiting Emory University

Carey averred that stationery bearing that letterhead was "used whenever we wrote about the scholarship fund." According to Carey, "we made a conscious effort to do it off duty," and "ninety-nine percent of it [work on the fund] was done on our own time." Carey said that he personally delivered fund contributions totalling over $16,000 directly to Emory University.

## Discussion

Because of the creation of and participation in the fund by Thurston and Carey, appellant sought one of two remedies: (1) disqualification of the Commonwealth's Attorney's office and appointment of a special prosecutor; or (2) a change of venue.

Mindful of appellant's right "to a fair trial and . . . due process," the trial judge found no conflict of interest by the Commonwealth's Attorney or police investigators affecting appellant's rights. Finding that some citizens may have believed that Thurston and Carey "were acting in some type of official

- 4 -

capacity," the trial judge found the officers had no interest in the outcome of appellant's case.

In Lux v. Commonwealth, 24 Va. App. 561, 568, 484 S.E.2d 145, 148 (1997) (citations omitted), we stated:

> In order to protect prosecutorial impartiality, a trial court has the power to disqualify a Commonwealth's attorney from proceeding with a particular criminal prosecution if the trial court determines that the Commonwealth's attorney has an interest pertinent to a defendant's case that may conflict with the Commonwealth's attorney's official duties.

"[T]he decision to disqualify an entire Commonwealth's Attorney's office is committed to the exercise of the trial court's discretion . . . ." Id. at 575, 484 S.E.2d at 152 (addressing situations where criminal defendant's former counsel is hired as prosecutor and explaining under what circumstances entire prosecutor's office must be disqualified; refusing to apply per se rule of disqualification).

The issue of whether to disqualify a Commonwealth's attorney in a case generally arises in one of two situations:

> "[T]he first is where the prosecutor has had some attorney-client relationship with the parties involved whereby he obtained privileged information that may be adverse to the defendant's interest in regard to the pending criminal charges. . . . A second [situation] is where the prosecutor has some direct personal interest arising from animosity, a financial interest, kinship, or close friendship such that his objectivity and impartiality are called into question."

Id. at 569, 484 S.E.2d at 149 (citation omitted).

Although some citizens may have believed that the fund was sponsored by the police, the evidence established that Carey and Thurston acted in their individual capacities to establish the scholarship fund. The fund was not intended to and did not benefit the police officers, the victim's family, or the Commonwealth's Attorney's office. No evidence showed that the Commonwealth's Attorney or staff sanctioned or sponsored the scholarship fund. All proceeds of the fund went directly to Emory University, where the victim had attended college.

Moreover, by taking annual leave to promote the fund and assigning administrative tasks to private citizens, the officers tried to insulate the fund from having the appearance of being a police-sponsored project. The fund announcements did not make references to the alleged perpetrators. The prosecutor's staff was not involved in the fund. Moreover, Carey and Thurston were not involved in investigating the crime or in collecting evidence.

Appellant did not produce any evidence of misconduct, bias, or conflict of interest by the Commonwealth's Attorney's Office that interfered with appellant receiving a fair trial. Compare Frye v. Commonwealth, 231 Va. 370, 380, 345 S.E.2d 267, 275 (1986) (finding no conflict of interest and refusing to disqualify prosecutor who was former director of bank where victim's wife employed), with Cantrell v. Commonwealth, 229 Va. 387, 393, 329 S.E.2d 22, 26 (1985) (finding conflict of interest

where victim's family hired a private attorney to institute a civil suit and court designated same attorney to act as a special prosecutor to assist the Commonwealth's attorney in Cantrell's criminal prosecution).

The activities of Thurston and Carey did not benefit or otherwise affect the police department or the prosecutor's office. Appellant failed to show any involvement in the fund by anyone in the Commonwealth's Attorney's office. Absent evidence suggesting a conflict of interest, the trial judge did not abuse her discretion in refusing to disqualify the entire Commonwealth's Attorney's office.

The trial judge found appellant's change of venue argument to be premature. It will be addressed in Part IV, infra.

## II. MOTION TO DISQUALIFY ENTIRE VENIRE

Following pretrial motions, two panels of prospective jurors were brought into the courtroom. The trial judge excused one panel of twenty-four members and directed them to return the next day. The other panel, also consisting of twenty-four members, was sworn and introduced. On voir dire, the trial judge asked preliminary questions, after which the attorneys were permitted to pose additional questions.

During voir dire, Cynthia Bishop, the third member of the first panel to be individually questioned, indicated she knew a great deal about the case from the media, and she felt that appellant and Turner were "both guilty." The following exchange

occurred:

[Defense Counsel]: Do you know whether any of the people on the jury panel have strong opinions from what you've heard them say before you came in the courtroom?

MRS. BISHOP: Yes.

[Defense Counsel]: Could you tell me what you know about that.

MRS. BISHOP: Most of them feel pretty strongly about it. A lot of them -- the women in particular -- they have daughters the age and so forth.

[Defense Counsel]: All right. And is that -- and I'm not suggesting you've done anything wrong because nobody told you you couldn't talk about things until you got into the jury selection process.

MRS. BISHOP: It was prior.

[Defense Counsel]: That's quite all right, but what we need to know is before you came up here, did you have a sense that this was the case you would be on?

MRS. BISHOP: I was hoping it wouldn't be.

[Defense Counsel]: I understand, and again we take no offense about that; but was there discussion or conversation amongst the prospective jurors?

MRS. BISHOP: Everyone.

[Defense Counsel]: And was most everybody saying they thought the people were guilty because of what they had seen and heard?

MRS. BISHOP: Right.

[Defense Counsel]: And do you recognize from the people you've seen up here today a number of the same people that you heard talking about it downstairs?

MRS. BISHOP: Yes.

[Defense Counsel]:  All right.  And would you agree that this feeling that you have discerned today is probably the same out in the community where you live?

MRS. BISHOP:  Yes.

[Defense Counsel]:  It's been discussed out there?

(Mrs. Bishop nodded affirmatively)[.]

The trial judge struck Bishop for cause.  Based on Bishop's assertion that the prospective jurors had discussed the case, defense counsel moved "for a mistrial on the grounds that the jury panel has been tainted and infected by preselection discussions which have rendered them incapable of being fair; and I think that it's indicative of the problem we have which is we're in a venue where I don't think we can get a fair trial."

Noting that Bishop was only the third potential juror to be individually questioned, the trial judge deferred ruling on the motion until additional panel members were questioned in order to corroborate or dispel Bishop's assertion.  After the trial judge questioned whether a mistrial motion was valid before a jury was sworn, defense counsel moved "to discharge the jury and reimpanel another."

Juror Bishop was the third of sixty jurors individually questioned.  When appellant initially moved for a new venire based on Bishop's claims of juror prejudice, the trial judge deferred ruling until "we get a little bit further into" questioning the jurors.

Fifty-seven potential jurors were brought into court and examined after Bishop was excused. Defense counsel did not ask each of the fifty-seven prospective jurors individually whether he or she had heard discussions about the case among the venire panel members. Instead, he asked only a few prospective jurors if they heard the case discussed by prospective jurors.[1] Of the jurors who were asked, all denied that discussions occurred. Moreover, other than Bishop, no jurors, including those struck for cause, indicated they were affected by comments or statements made by someone discussing the case in their presence.

Because the jury had not been sworn, trial had not commenced, jeopardy had not attached, and no mistrial could be declared. Therefore, appellant's remedy lay in disqualifying the entire jury venire. Whether to disqualify an entire venire is a matter committed to the sound discretion of the trial judge. See Mueller v. Commonwealth, 244 Va. 386, 403-04, 422 S.E.2d 380, 391 (1992). Despite the number of potential jurors individually examined after Bishop, no evidence corroborated Bishop's allegation that the prospective jurors discussed appellant's guilt. See id. at 403, 422 S.E.2d at 391 (noting lack of evidence that venire was tainted). Absent such evidence, the trial judge did not abuse her discretion in refusing to

---

[1] The record indicates that only five of the twenty-seven female prospective jurors to follow Bishop were specifically asked whether the case was earlier discussed by female members of the venire. Those panel members included jurors Edgell, Garrett, Headspeth, Perron and Garringer.

disqualify the entire venire.

### III. MOTIONS TO STRIKE JURORS FOR CAUSE

An accused is constitutionally guaranteed the right to trial by an impartial jury. See U.S. Const. amends. VI, XIV; Va. Const. art. I § 8; see also Code § 8.01-358; Rule 3A:14. "Trial courts, as the guardians of this fundamental right, have the duty to procure an impartial jury," a responsibility primarily discharged "through meaningful voir dire." Griffin v. Commonwealth, 19 Va. App. 619, 621, 454 S.E.2d 363, 364 (1995). "[T]he test of impartiality is whether the venireperson can lay aside . . . preconceived views and render a verdict based solely on the law and evidence presented at trial." Id. "A juror who holds a preconceived view that is inconsistent with an ability to give an accused a fair and impartial trial, or who persists in a misapprehension of law that will render him incapable of abiding the court's instructions and applying the law, must be excluded for cause." Sizemore v. Commonwealth, 11 Va. App. 208, 212, 397 S.E.2d 408, 410 (1990) (emphasis added). "[I]n determining whether a prospective juror should have been excluded for cause, we review the entire voir dire, rather than a single question and answer." Barnabei v. Commonwealth, 252 Va. 161, 173, 477 S.E.2d 270, 277 (1996) (citation omitted), cert. denied, 117 S. Ct. 1724 (1997). Reasonable doubt that a juror possesses the ability to render fair and impartial service must be resolved in favor of the accused. See Breeden v. Commonwealth, 217 Va. 297, 298, 227

- 11 -

S.E.2d 734, 735 (1976).

Prospective jurors need not "be totally ignorant of the facts and issues involved in a case." Pope v. Commonwealth, 234 Va. 114, 124, 360 S.E.2d 352, 358 (1987). It is sufficient that they can set aside any impression or opinion and decide the case solely on the evidence presented at trial. See id.

"The partiality or impartiality of an individual juror is a factual issue best determined by the trial court." Watkins v. Commonwealth, 229 Va. 469, 480, 331 S.E.2d 422, 431 (1985). On appeal, "we must give deference to the trial court's decision whether to retain or exclude individual veniremen because the trial court 'sees and hears the juror.'" Eaton v. Commonwealth, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990) (quoting Wainwright v. Witt, 469 U.S. 412, 426 (1985)). Thus, we will not disturb the trial court's decision "absent a showing of 'manifest error.'" Id. (quoting Spencer v. Commonwealth, 240 Va. 78, 94, 393 S.E.2d 609, 619, (1990)). See also Weeks v. Commonwealth, 248 Va. 460, 475, 450 S.E.2d 379, 389 (1994).

### Juror Evans

During individual voir dire, Timothy Evans indicated that he was aware of the case from media reports. The following exchange took place:

> [Defense Counsel]: [C]an you tell us from what you've heard or read what your -- what you know or believe you may know about the case in terms of facts or background . . . .
>
> MR. EVANS: Right. That's hard to say, I -- Of course, you tend to draw some

opinions. I can't really say. I'll be honest with you. I cannot really say.

[Defense Counsel]: With respect to the opinions that you feel you may have drawn from what you've read or heard, can you share those with us or what, if any, that you have.

MR. EVANS: No. I really don't to be honest with you.

[Defense Counsel]: Do you have some opinions that you have formed about the matter or the case or any aspects of the case?

MR. EVANS: Well, I guess the one opinion I do have is that since I read in the paper that there was an admission that the crime had occurred, that they had done it. They meaning I don't know which.

[Defense Counsel]: All right. And I don't want to -- I'm not trying to put anything in your mouth, but are you saying that at least from what you've read and heard you have formed an opinion that because there had been some confession to something that the men who are involved are guilty?

MR. EVANS: I'm not sure about that. I'm not sure about it. Opinions aren't facts.

[Defense Counsel]: I understand that.

MR. EVANS: You tend to get that inclination when you first read it. Yes.

[Defense Counsel]: All right. And do you think that depending on what you hear in this case your prior knowledge and opinions about the admissions of people involved might affect the way you view the case?

MR. EVANS: No. I don't think so.

[Defense Counsel]: Now, having -- Do you acknowledge that you have formed some tentative opinion about the case based on what you've read.

MR. EVANS: Yes.

Upon further questioning, Evans assured defense counsel that he could lay aside everything he heard or read through the media, determine appellant's guilt or innocence based solely on the evidence presented at trial, and give appellant a fair and impartial trial.

The prosecutor then asked Evans to explain his statement regarding facts and opinions.  Evans responded as follows:  "I form opinions all the time both in business and in personal life.  Facts can either change my opinions or confirm my opinions.  I recognize them as opinions."  Evans avouched that he was "very confident" he could set aside any preconceived opinions and base his decision on the facts presented at trial.  Following argument on whether to strike Evans for cause, the trial judge denied the motion.

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinions as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961) (emphasis added).

- 14 -

Despite Evans' acknowledgment that he had formed an initial impression upon reading news accounts, viewing the totality of Evans' voir dire testimony, we find no manifest error in seating him. Following defense counsel's intense and thorough voir dire, Evans provided, in his own words, an explanation that evidentiary facts can confirm or dispel initial opinions. Furthermore, he unequivocally expressed confidence in his ability to set aside any initial impressions and decide the case on the facts presented at trial.

## Juror Johnson

During the preliminary group questioning of the venire panel, defense counsel asked whether appellant's arrest and prosecution, by itself, would affect the jurors' impartiality. He then asked, "[D]o you feel just because [defendant] is here, he must have done something wrong, and that might affect your view of this case?" Donald Johnson responded, "You can put me down for that one." Later, defense counsel asked members of the group to indicate preliminarily if they might have a problem with the credibility of people who initially give a false statement to police and later profess to give a true account. Johnson indicated that he might be affected.

During individual voir dire the following day, defense counsel inquired into Johnson's earlier responses. The following colloquy occurred:

> MR. JOHNSON:  If I did raise my hand on that
> [question], it would be more like if he's
> arrested for it, there's some reason he got

- 15 -

arrested for it.  It's -- you know -- I didn't get arrested for it.

[Defense Counsel]:  I understand.  And what I was trying to understand from your answer to that question was whether the fact that he has been charged and is on trial, would that alone give you some feeling or belief that he might be guilty just because he's been charged?

MR. JOHNSON:  If I raised my hand to that one yesterday -- which I'm not sure -- I do not believe that.

[Defense Counsel]:  All right.

MR. JOHNSON:  I do not believe that way.

[Defense Counsel]:  All right.  Now, I also believe that you had indicated I thought -- I asked this question.  That the defendant is charged with the alleged crimes of murder, abduction, attempt to rape and sexual penetration with object.  Do any of you have any feelings or opinions about the alleged crimes themselves -- these crimes -- which would prevent you from giving the defendant a fair trial on the charges against him?  Again I had a note.  I thought you had indicated that you --

MR. JOHNSON:  If I raised my hand, it was that I have feelings about those crimes but whether or not I could give him a fair trial is another issue.  I think I can.  I just think those crimes are very heinous.

Johnson continued to aver that he could be fair and impartial.  As to the effect of possible false statements made by appellant to police, the following exchange took place:

[Defense Counsel]:  All right.  Well, when you were asked yesterday if you had any feelings or opinions which caused you to believe that just because someone at some point has lied to the police about a matter under investigation that nothing that that person says concerning the investigation can

ever be believed, I'm just trying to understand. I thought you raised your hand.

MR. JOHNSON: That is probably true except for as evidence dictates. I mean if the evidence dictates they are telling the truth, then you have to believe it; but I would say on their face value, on their word I would have a hard time believing them again.

[Defense Counsel]: All right. So would it be a fair characterization to say that at least as we start the trial you have a preconceived notion about someone who has lied to the police that would make it hard for you to accept anything else they said to them as being true?

MR. JOHNSON: I guess yeah, you would have to say that because if they lied once, they have something to hide.

Johnson admitted that, if the evidence proved that appellant lied to the police once, he would have difficulty believing appellant's subsequent statements. However, when asked if it would be difficult for him to be objective and impartial and render a fair verdict, Johnson said it would not. According to Johnson, if appellant is "saying something I would have to balance that against the evidence in the case. It's not that I'm just going to take his word for it. I would have to verify what he's telling me according to the evidence presented."

Johnson assured counsel he could base his decision on the facts presented at trial and could be fair and impartial. Johnson also said he had not heard enough about the case to form a preconceived opinion about it. Defense counsel moved to strike Johnson for cause. In denying the motion, the trial judge

- 17 -

provided the following explanation:

> I listened very carefully as we had him listed, I had him listed, you had him listed and I think both listed for his answers; and I listened very carefully to his explanations, and I watched the way he sat, I watched the way he looked, I watched his mannerisms.  We all make up these questions, and we know what we're talking about; and you take a group of people that come into a room they've never been in before with people watching them, and you ask them questions that are compound questions that have legal terms in them that are stilted.  They're not in everyday language, and you get a whole group of people sitting there; and the next thing you know you have hands up.  He had reasonable and plausible explanations for why he said what he said; and he didn't say anything yesterday.  We got shows of hands on questions; and I'm satisfied with his answers; and to be honest with you, going into it I wasn't sure I was going to be satisfied with his answers.  I listened to his answers, and I was satisfied with them; and as far as any preconceived idea, I wrote down some notes about what he said; and when you asked him about changing statements, he said that a person could lie and then a person could tell the truth, and he could certainly if the evidence shows that, he believes that could happen, that he would have -- that if he knew somebody lied, he would have a hard time believing they were telling the truth the next time; but that would depend on the evidence, which -- and I pulled the jury instructions to look at the instructions on credibility of the defendant; and certainly if there is evidence in the trial that the defendant made a prior inconsistent statement, that is something you can certainly take into account along with the other evidence which is what he said he would do in judging the credibility of the witness; and that's what the instructions say.

Johnson's responses during individual voir dire differed

from his initial responses the preceding day during group questioning.  However, Johnson adequately explained in detail that some of his responses to questions propounded to the group did not accurately reflect his views.  Based upon the entirety of Johnson's voir dire, including Johnson's explanations and the trial judge's observations of Johnson's demeanor, we find no manifest error in seating him.

                              Juror Roache

     During individual voir dire, Holly Roache denied having

formed any preconceived opinions about appellant's guilt.  The

following dialogue then occurred:

          [Defense Counsel]:  Is there any hesitation
          on your part about that?  In other words, do
          you think you might have some feelings that
          are coming out on this?

          MS. ROACHE:  I feel like I could be open as
          far as trying to formulate an opinion.

          [Defense Counsel]:  All right.  Do you think
          this defendant is guilty of something?

          MS. ROACHE:  It's very possible.  Yes.

          [Defense Counsel]:  Is that because of what
          you've read in the paper or what you've seen
          on television?

          MS. ROACHE:  From the reports.  Uh-huh.

           *      *      *      *      *      *      *

          [Defense Counsel]:  Would you agree that
          because you have told me -- quite honestly
          -- that it is very possible that this
          defendant is guilty based on what you have
          read and seen, that that feeling that you
          have might affect your ability to be totally
          fair and impartial in viewing the case if you
          were a juror?

          MS. ROACHE:  I'd have to say no because I
          know that everything that's reported or
          printed is not always accurate.

          [Defense Counsel]:  And why is it that you
          feel that he's very possibly -- or I think
          you said it's very possible that he is
          guilty?

          MS. ROACHE:  You said guilty of something?

          [Defense Counsel]:  Yes, of something.  I'm
          sorry.  Yes.  Pardon me.  You're exactly

                               - 20 -

right.

MS. ROACHE:  You indicate of what.

[Defense Counsel]:  Well is there something specific that you feel he's very possibly guilty of?

MS. ROACHE:  No.  I guess it was just the way you formulated the question.

[Defense Counsel]:  Well, what I'm trying to understand now is -- because I still have the sense there may be something bothering you; and when you said to me it's very possible he's guilty of something, that's based on what you've read and heard?

MS. ROACHE:  Actually I guess what sticks in my mind is yesterday during the summation, there was mentioned about alcohol.  So that's what's kind of sticking in my mind.

[Defense Counsel]:  And what is it about alcohol.

MS. ROACHE:  Oh.  I mean not that I have anything against it, but because it was stated that he had been drinking a lot, since that was stated as a fact, then I mean he could be guilty of being drunk.

[Defense Counsel]: All right.  That's true.  What I'm really interested in is he's charged with murder and abduction and attempted rape and penetration -- sexual object penetration of Ms. Evans; and based on what you've read or what you've heard and what you know about the case from what you may have been exposed to outside the courtroom, do you feel that it's very possible that he could be guilty of one of those charges that he's on trial for here today?

MS. ROACHE:  I really don't know because I haven't heard the evidence.


Defense counsel moved to strike Roache for cause because of

- 21 -

her response that appellant might be guilty of something and because of Roache's "demeanor." In overruling the motion, the trial judge noted that she paid close attention to Roache because Roache appeared shy and tentative in her responses. The trial judge explained:

> Her voice -- she was very soft-spoken, and my initial reaction to her being shy I don't think changed. I believe she was truthful from the other signs I watched; and I -- We're making record here. My interpretation was she was just shy and soft-spoken. I listened to the answers, but I did watch her because I noticed it as soon as she walked in just the tentativeness.
>   As far as her answer, that sent a red flag up too; and then when I listened to her go on with the answer and even answer your follow-up questions the many times you mentioned, You seemed reluctant. Is there anything? I mean you said it in a nonthreatening manner. When [the prosecutor] got up, he asked in a nonthreatening manner. She explained why she said what she said.

Appellant points to Roache's explanation that she felt appellant might be guilty of something, such as being drunk. As noted earlier, it is not uncommon or improper for jurors to form "some impression or opinions" as to the merits of a case or to have a "preconceived notion as to the guilt or innocence of an accused" based on pretrial publicity. See Dowd, 366 U.S. at 722-23. Thus, the mere fact that Roache may have entertained an opinion based on news reports does not disqualify her from serving on the jury. After extensive questioning by defense counsel, Roache unequivocally avouched that she could fairly and objectively judge appellant based on the evidence presented at

trial and lay aside any preconceived opinions.

Moreover, during group questioning of the panel members, defense counsel remarked that "the evidence in this case will also disclose at a certain time under examination in this case that the defendant, Billy Brown, was heavily intoxicated." Based on counsel's representation of appellant's heavy alcohol consumption, Roache could have reasonably believed that appellant may have been guilty of being drunk in public. See Code § 18.2-388 (making it a Class 4 misdemeanor to be intoxicated in public).

Based upon the entirety of Roache's voir dire, including the trial judge's expressed observations of Roache's demeanor and responses, we find no manifest error in seating her.

The trial judge had the opportunity to observe each juror's demeanor when evaluating responses to counsel's questions and the court's instructions. Considering the voir dire as a whole, including the first-hand observations made by the trial judge, who closely scrutinized the jurors' responses, the record demonstrates that the challenged jurors could lay aside any preconceived views or opinions and render a verdict based solely on the evidence presented at trial. Therefore, we cannot say the trial judge committed manifest error in seating them. Accordingly, the trial judge did not abuse her discretion in refusing to strike these jurors for cause.

IV. MOTION FOR CHANGE OF VENUE

- 23 -

"It is presumed that a defendant can receive a fair trial in the locality where the offense occurred, and the burden is on the accused to overcome that presumption by clearly demonstrating widespread prejudice against him."  LaVasseur v. Commonwealth, 225 Va. 564, 577, 304 S.E.2d 644, 651 (1983).

> A change of venue based on pre-trial publicity is required when the defendant demonstrates that there is "widespread" prejudice against him and that such prejudice would, with reasonable certainty, prevent a fair trial.  Whether to grant a motion for a change of venue is a matter of judicial discretion, and we will reverse the decision of the trial judge only for an abuse of that discretion.

Chandler v. Commonwealth, 249 Va. 270, 275, 455 S.E.2d 219, 222 (1995) (citations omitted).  "'[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair.'" George v. Commonwealth, 242 Va. 264, 274, 411 S.E.2d 12, 18 (1991) (quoting Dobbert v. Florida, 432 U.S. 282, 303 (1977) (refusing to presume unfairness because of extensive publicity absent "trial atmosphere . . . utterly corrupted by press coverage")).  "A significant factor in determining whether a change of venue is warranted is whether the media reports are factual and accurate."  Mueller, 244 Va. at 398, 422 S.E.2d at 388.

After interviewing a total of sixty potential jurors, a panel of twenty-four prospective jurors was assembled.  Appellant renewed his argument for a change of venue, and the trial judge

- 24 -

denied it.

The trial judge struck thirty-six members of the venire for cause. The trial judge allowed defense counsel wide latitude to individually and extensively question the prospective jurors during a four day period.

The record discloses that thirteen of the thirty-six venirepersons who were stricken for cause were stricken solely because they had formed an opinion based on pretrial publicity. Nine additional members were stricken because they could not be impartial based on pretrial publicity and because of some other reason.[2] The other fourteen stricken jurors were dismissed for reasons unrelated to the publicity.[3] She listened to the jurors' responses and unhesitatingly struck all who equivocated or whose

---

[2]The additional reasons affecting their impartiality included having one or more daughters close to the age of the victim, having a family member or good friend who was sexually assaulted, frequenting the bar where the victim was last seen and knowing the employees, having sympathy for the victim's family, knowing some witnesses, and knowing about past scandals involving the Navy.

[3]The reasons included the following: the belief that appellant was possibly guilty because SEAL training made him capable of inflicting the death blow; beliefs regarding reputations of SEALS and their boisterous lifestyle; counsel argued about seating the juror in front of the prospective juror; the inability to believe someone who lied to the police; a moral dislike of people who drink to excess; the inability to understand English fluently; the inability to be fair due to close business affiliation with the Navy; business/job considerations, namely, scheduled trips that would negatively affect business; the heinousness of the crime; feelings of sympathy for the victim and/or her family; the feeling upon first seeing appellant that he appeared to be guilty; relating too closely with victim in age and conduct; working in jail where codefendant incarcerated.

answers hinted an inability to be impartial.

In denying counsel's motion for a change of venue, the trial judge explained:

> I think we have gotten a jury that is a fair cross section of the community. . . .  I hate to quote a number.  There were at least several people on there who said they had heard nothing about the case.  We had varying degrees.  I believe one of the panel members today said that their knowledge had been minuscule.
> I'm not going to go back through my notes and cite everything.  Suffice it to say, I think we have selected a fair cross section that can be fair both to the Commonwealth and to the defendant.

Of the sixty members of the venire, twenty-four acknowledged an awareness of the memorial scholarship fund.  No one had contributed to the fund or was affiliated with businesses or organizations involved with it.

The June 1995 murder of a vacationing traveler by a sailor resulted in a great deal of publicity in an area abounding with tourists and naval personnel.  However, the trial commenced eleven months after the murder, thus lessening the impact from the initial intense media coverage.  In fact, many of the prospective jurors indicated that they learned about the crimes through media reports at the time of the crimes.  A large number also indicated only a general knowledge of the crimes, lacking much detail.  Moreover, appellant never alleged that the media accounts were factually inaccurate.

The trial judge allowed defense counsel wide latitude in

questioning potential jurors in order to find bias.  To that end, defense counsel posed approximately twenty-five questions to the venire as a group.  Later, the trial judge noted that defense counsel has "a list of some thirty-seven questions here that you're asking each one of these jurors" individually.  Some of the questions confused the jurors, lengthened the voir dire process, and made it more difficult to identify impartial witnesses.[4]

### Summary

Thirteen of the sixty venirepersons, or twenty-two percent, evinced bias or partiality based solely on publicity.  Nine additional venirepersons evinced an inability to be impartial based on pretrial publicity in conjunction with some other reason.  Therefore, only twenty-two members of the entire venire of sixty members, or thirty-seven percent, were struck because of some sort of pretrial publicity.  Based on the nature of the case and the broad latitude allowed in questioning venire members, the record does not affirmatively demonstrate that the pretrial publicity in this case prejudiced appellant and prevented him from receiving a fair trial.  See Mueller, 244 Va. at 398-99, 422

---

[4]For example, defense counsel advised prospective jurors that appellant told inconsistent stories to the police, and he asked whether this inconsistency might affect their ability to believe later statements appellant made to police.  Such a question would and did elicit doubts from prospective jurors. These doubts, however, relate to juror responsibility in assessing witness credibility and do not disclose or evince impartiality or bias.

S.E.2d at 388-89 (finding no error in denying motion to change venue where forty-seven prospective jurors examined before getting impartial panel; despite extensive publicity, defendant made no claim that media reports were inaccurate); Buchanan v. Commonwealth, 238 Va. 389, 407, 384 S.E.2d 757, 768 (1989) (finding no error in refusal to change venue where there was extensive publicity and where thirty-six jurors questioned before getting panel of twenty); Briley v. Commonwealth, 221 Va. 563, 570, 273 S.E.2d 57, 61 (1980) (finding no error in refusing to grant motion for change of venue where "[i]t was necessary to examine only forty-six individuals of fifty-two summonsed to obtain" impartial jury panel).  Therefore, the trial judge did not abuse her discretion in denying appellant's motion for a change of venue.

For the reasons stated, we affirm the convictions of the trial court.

Affirmed.