COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Coleman and Frank
Argued at Salem, Virginia


EMMETT WARD CRESSELL, JR.
                                        OPINION BY
v.   Record No. 0270-99-3        JUDGE SAM W. COLEMAN III
                                         JULY 11, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF GRAYSON COUNTY
                    J. Colin Campbell, Judge

        Mark W. Claytor (Jeffrey L. Dorsey, on
        brief), for appellant.

        Pamela A. Rumpz, Assistant Attorney General
        (Mark L. Earley, Attorney General, on brief),
        for appellee.


     Emmett Ward Cressell was convicted in a jury trial of first

degree murder. He was sentenced to life imprisonment and fined

$100,000. On appeal, Cressell argues that the trial court erred

by denying his motion for a change of venue and by failing to

strike three jurors for cause. He also argues that the evidence

is insufficient to support his conviction. Finding no error, we

affirm.

                      I.  BACKGROUND

     On July 24, 1997, Cressell, Louis Ceparano, Hazel Anderson,

Christy Harden, and G.P. Johnson spent the evening and early

morning hours of July 25, celebrating Harden's twenty-first

birthday. At some point in the evening, the birthday celebration

moved to Ceparano's trailer.  Everyone was drinking heavily except Anderson.  Before the evening ended, Johnson, who was of African-American descent, became the victim of a gruesome murder. Johnson, who was intoxicated, was doused with gasoline, set afire, burned alive, and decapitated.

Hazel Anderson testified that at least twice during the evening Cressell grabbed Johnson by the shirt collar, called him a "nigger," and accused Johnson of trying to start a fight between Cressell and Ceparano.  Later that evening, Cressell and Ceparano were "horseplaying" with Johnson on a mattress on the floor.  Both Cressell and Ceparano stated several times that they were going to take Johnson outside and "burn him on a white cross."  Anderson testified that Cressell took off Johnson's watch and, in response to Johnson's request to return the watch, Cressell stated that "where you're going, they had their own time."  Cressell then grabbed Johnson's shoulders while Ceparano grabbed Johnson's legs, and together, the two carried Johnson outside.  Johnson, apparently not comprehending the situation, told Cressell and Ceparano to be careful not to hurt his ankle, which he had injured in a car accident a few weeks earlier.  Johnson stated, as he was being carried out of the trailer, "why don't you just shoot me."

Harden, who remained in the trailer with Anderson, testified that she looked out the window and noticed a large fire.  Harden stepped onto the front porch and realized that Johnson was being

burned alive. She testified that Ceparano was standing near Johnson and Cressell was walking back in the direction of the trailer. Cressell and Ceparano returned to the trailer without Johnson. Both Anderson and Harden stated that they smelled gasoline fumes, and Anderson testified that she smelled the fumes emanating from Cressell when he returned to the trailer. Ceparano went back outside, and when Anderson began to follow Ceparano, Cressell stated sarcastically, "it'd be best if you don't go outside." Later, Ceparano cornered Anderson in the kitchen and told her in a threatening manner that he had walked Johnson home. He threatened to kill her if she told anyone anything different. Ceparano again went outside, and when he returned, he had blood on the front of his pants. Ceparano changed clothes and washed his pants.

Harden testified that Cressell told her that Ceparano poured gasoline on Johnson and set him on fire. She testified that she and Cressell left the trailer, flagged down a passing car, and proceeded to the Sheriff's office where Cressell informed the deputies that Ceparano had murdered Johnson.

In Cressell's initial statements to the authorities, he denied any involvement in Johnson's murder. He later admitted, however, that he helped Ceparano carry Johnson outside and across the driveway. Cressell consistently denied pouring gasoline on Johnson or setting him on fire. Rather, Cressell stated that he

saw Ceparano pour gasoline on Johnson and set him on fire. Ceparano denied murdering Johnson.

Johnson's burned, decapitated body was found near Ceparano's trailer. When investigators arrived at the scene, they discovered Johnson's body lying in a prone position still on fire. The investigator observed two burn sites on Ceparano's property. At the second burn site, the investigator found "what appeared to be a piece of a skull," a gas can, beer cans, a blood stain, and debris piled on top of Johnson's body. There appeared to be a trail of blood from the first burn site to the second. At the first burn site, investigators found a belt buckle and loose change. Johnson's wallet was lying on the ground a few feet from the back door of Ceparano's trailer, and Johnson's checkbook and watch were on the loveseat in the trailer. Johnson's body had been decapitated and his head was buried beneath his body in a hole more than a foot deep. Near the trailer, the investigator found a shovel and a splitting maul. Ceparano had blood on his hands and on his clothing.

An autopsy of Johnson's body revealed that the cause of death was "inhalation of flame with edema of the lungs and burning of the respiratory passages." The evidence indicated that the fire had been started using an accelerant. Johnson was decapitated postmortem. Johnson's skull suffered a number of blunt trauma and

- 4 -

chop injuries.  His skull was fractured, and his brain was out of the cranial cavity due to the nature of the injuries.

## II.  ANALYSIS

### A.  Motion for a Change of Venue

Prior to trial, Cressell moved for a change of venue, arguing that widespread media attention created "community prejudice" against him.  He argued that the news reports were inflammatory, hostile, and prejudicial.  Cressell stated that a newspaper photograph of him in a prison uniform, wearing handcuffs and leg irons, created an aura and impression in the minds of prospective jurors in the community that he was guilty.  The media also impermissibly reported his criminal record and prejudicial evidence concerning particulars of the crime that would be inadmissible at trial.  Although Cressell conceded at oral argument that the media reports were factually accurate, he argued that the coverage was inflammatory, pointed, and selective, because the photographs in the newspaper articles of the victim showed him as a "young, good-looking black man in a dress marine corps uniform with a background of the American flag," while the newspaper articles pictured him, the defendant, in "slovenly jail garb, a mug shot."  In addition, Cressell argues that the media portrayed the murder as a "hate crime" and Grayson County as a "hot bed of racism."  He asserts that by doing so, the media put the citizens of Grayson County "on trial" to defend their

reputation as jurors and that is the "reason that [he] was convicted of anything at all."

At counsel's request, the court took the motion for change of venue under advisement pending a determination of whether a qualified and unbiased jury panel could be seated. After voir dire of eighty-one potential jurors, a panel of twenty-four jurors was seated. Of the eighty-one prospective jurors, the court excused twenty because each expressed the view that he or she had formed an opinion about the defendant's guilt or innocence from news accounts that he or she would be unable to set aside. The court excused nine prospective jurors because each was opposed to the death penalty. Twenty-eight others were excused for "various sundry reasons." The court denied the motion for a change of venue, noting that, although the case had received widespread publicity, a qualified jury had been selected.

"'It is presumed that a defendant can receive a fair trial in the locality where the offense occurred, and the burden is on the accused to overcome that presumption by clearly demonstrating widespread prejudice against him.'" Brown v. Commonwealth, 28 Va. App. 315, 336, 504 S.E.2d 399, 409 (1998) (quoting LaVasseur v. Commonwealth, 225 Va. 564, 577, 304 S.E.2d 644, 651 (1983)). "'A change of venue based on pre-trial publicity is required when the defendant demonstrates that there is "widespread" prejudice against him and that such prejudice would, with reasonable

- 6 -

certainty, prevent a fair trial.'"  Brown, 28 Va. App. at 336, 504 S.E.2d at 409 (quoting Chandler v. Commonwealth, 249 Va. 270, 275, 455 S.E.2d 219, 222 (1995)).  The trial court's decision whether to grant a motion for change of venue is reviewed for an abuse of discretion.  See Kasi v. Commonwealth, 256 Va. 407, 420, 508 S.E.2d 57, 64 (1998), cert. denied, 119 S. Ct. 2399 (1999).

"'[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair.'"  George v. Commonwealth, 242 Va. 264, 274, 411 S.E.2d 12, 18 (1991) (quoting Dobbert v. Florida, 432 U.S. 282, 303 (1977) (abrogation on other grounds recognized by Grimes v. State, 807 S.W.2d 582 (Tex. Crim. App. 1991)).  "The fact that there have been media reports about the accused and the crime does not necessarily require a change of venue."  Roach v. Commonwealth, 251 Va. 324, 342, 468 S.E.2d 98, 109 (1996) (citation omitted).  "A significant factor in determining whether a change of venue is warranted is whether the media reports are factual and accurate."  Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992) (citation omitted).  "Another significant factor the trial court must consider is 'the difficulty encountered in selecting a jury.'"  Roach, 251 Va. at 342, 468 S.E.2d at 109 (quoting Mueller, 244 Va. at 398, 422 S.E.2d at 388).

Cressell has not overcome the presumption that he received a fair trial in Grayson County.  Here, virtually every prospective juror admitted hearing about the case through the media or by speaking with others.  After extensive voir dire, twenty-four jurors were selected who "unequivocally answered that they could enter the jury box with an open mind and wait until the entire case was presented before reaching a fixed opinion."

> Prospective jurors are not required or expected to be completely ignorant of the facts and the issues surrounding a highly publicized case; all that is required is that a prospective juror can lay aside his or her impression or opinion and render a verdict based upon the law and evidence.

Ascher v. Commonwealth, 12 Va. App. 1105, 1114, 408 S.E.2d 906, 912 (1991) (citation omitted).

Moreover, the jury was selected with relative ease, and more prospective jurors were excused for reasons unrelated to publicity than were excused for holding fixed, preconceived notions about Cressell's guilt.  See Brown, 28 Va. App. at 337-38, 504 S.E.2d at 409-10 (finding no error in denying motion where twenty-four of sixty prospective jurors acknowledged awareness of publicity); Thomas v. Commonwealth, 244 Va. 1, 10-12, 419 S.E.2d 606, 611-12 (1992) (affirming trial court's ruling denying change of venue where thirty-one percent of prospective jurors questioned were excused because of pretrial publicity).  Finally, Cressell conceded at oral argument that the media reports were factually

- 8 -

accurate.  See <u>Mueller</u>, 244 Va. at 398, 422 S.E.2d at 388; <u>see also</u> <u>Buchanan v. Commonwealth</u>, 238 Va. 389, 407, 384 S.E.2d 757, 767 (1989) (noting that media coverage disclosing the accused's criminal record is insufficient to justify a change of venue). Accordingly, the trial court did not abuse its discretion in denying the motion for a change of venue.

### B.  Jury Challenge

Cressell argues that the trial court erred in failing to strike three prospective jurors for cause.  Cressell contends that prospective jurors Organ and Hancock should have been struck because they were members of a "poisoned panel" that he sought to have struck in its entirety and that juror Thompson should have been struck because during <u>voir</u> <u>dire</u> she expressed sentiments that she could not be indifferent to the cause.

"The right to a trial by an impartial jury is guaranteed under both the United States and Virginia Constitutions."  <u>Gosling v. Commonwealth</u>, 7 Va. App. 642, 645, 376 S.E.2d 541, 543 (1989) (citing U.S. Const. amend VI; Va. Const. art I, § 8).  "[S]o long as the jury that sits is impartial," the compelled use of a peremptory challenge by a defendant to remove a biased juror does not violate the Sixth Amendment because peremptory challenges are "auxiliary" and "are not of federal constitutional dimension."

United States v. Martinez-Salazar, 120 S. Ct. 774, 779-80 (2000).[1]

However, the Virginia Supreme Court has held in Breeden v. Commonwealth, 217 Va. 297, 300, 227 S.E.2d 734, 737 (1976), that as a matter of state law, relying on Code §§ 8.01-357 and -358, an accused is entitled to a panel of jurors free from exception before exercising peremptory challenges.  Thus, we review a trial court's decision whether to strike a prospective juror for cause for an abuse of discretion and that ruling will not be disturbed on appeal unless it appears from the record that the trial court's action constitutes manifest error.  See Stockton v. Commonwealth, 241 Va. 192, 200, 402 S.E.2d 196, 200 (1991).

> The constitutional guarantee of an impartial
> jury does not contemplate excluding those
> who have read or heard news accounts
> concerning the case or even exclusion of
> those who may have formed an opinion based
> on such accounts. . . .  The test, instead,
> is whether a juror is capable of laying
> aside a preconceived opinion and rendering
> "a verdict solely on the evidence."

Wilmoth v. Commonwealth, 10 Va. App. 169, 173, 390 S.E.2d 514, 516 (1990) (citations omitted).

### 1.  Jurors Organ and Hancock

Jurors Organ and Hancock were members of a thirteen member panel that was initially subjected to voir dire as a group.

---

[1] Because the dispositive holding in Martinez-Salazar involved a due process challenge under Fed. R. Crim. P. 23, it is inapposite to our case.

- 10 -

During voir dire, eleven of the prospective jurors stated they had formed opinions about the accused's guilt or expressed other sentiments which required that the judge excuse those eleven jurors for cause. Organ and Hancock were the two remaining jurors from the panel of thirteen who were not removed for cause. Cressell timely objected to the seating of jurors Organ and Hancock on the ground that they were present and unduly influenced when the other prospective jurors stated in Organ's and Hancock's presence that each had formed an opinion about the case, or explained how they knew the parties, or that they were prejudiced toward the testimony of law enforcement.

Although none of the eleven jurors excused expressly stated his or her opinion about Cressell's guilt or innocence, one readily concludes from the responses that most, if not all, believed Cressell was guilty. However, both Organ and Hancock unequivocally stated that they did not hold fixed, preconceived opinions regarding Cressell's guilt or innocence and affirmatively stated that they could be fair and impartial. Both answered affirmatively when asked whether they understood that Cressell was presumed innocent until proven guilty and that he had no burden to present any evidence. Both Organ and Hancock also answered affirmatively when asked if they could set aside any preconceived views and render a verdict based solely on the law and evidence presented at trial. Moreover, Organ and Hancock stated that they

were not influenced by the fixed opinions of the eleven prospective jurors who were excused. Accordingly, the trial court did not err in refusing to strike Organ and Hancock for cause.

### 2. Juror Thompson

Cressell argues that the court erred by refusing to strike Thompson for cause and that the court's refusal to strike Thompson was not cured by the defense's use of a peremptory challenge.

Cressell correctly asserts that his use of a peremptory strike to remove Thompson does not cure prejudice caused to him by seating a biased juror. See Brooks v. Commonwealth, 24 Va. App. 523, 530-31, 484 S.E.2d 127, 130 (1997) (finding that a prosecutor's use of a peremptory challenge to remove a prospective juror who should have been stricken for cause will not cure possible prejudice); see also DeHart v. Commonwealth, 20 Va. App. 213, 216, 456 S.E.2d 133, 134 (1995). "A defendant has a right to an impartial jury drawn from 'a panel [of twenty] free from exceptions.'" Breeden, 217 Va. at 300, 227 S.E.2d at 737 (citation omitted); see also Code §§ 8.01-357, 8.01-358, 19.2-262(2). "If a venireman who should have been removed for cause is allowed to remain on the jury panel, the accused is 'denied the opportunity of having another impartial person on his jury.'" Brown v. Commonwealth, 29 Va. App. 199, 212, 510 S.E.2d 751, 757 (1999) (citation omitted). The trial court, however, did not err in refusing to strike Thompson for cause.

During voir dire of Thompson, the following colloquy occurred:

> COURT: Can you put what you've read or heard about it totally aside and have an open mind when you enter the jury box?
>
> THOMPSON: Yes sir.
>
> *    *    *    *    *    *    *
>
> [DEFENSE COUNSEL] CLAYTOR: Have you formed any opinion about his [Cressell's] character or anything like that based upon what you've read in the paper?
>
> THOMPSON: (No audible response.)
>
> [DEFENSE COUNSEL] CLAYTOR: Do you think [the defendant is] guilty of something as he sits here? I see you nodding your head Ms. Thompson. What do you mean by that?
>
> THOMPSON: I feel like he's probably guilty of something because why would he be here at this far.
>
> *    *    *    *    *    *    *
>
> [DEFENSE COUNSEL] CLAYTOR: Do you believe that someone who is present during the commission of a crime and possibly could have stopped it shares responsibility for that crime and is therefore guilty of at least something? I see you shaking your head yes Ms. Thompson.
>
> THOMPSON: Yes.
>
> [DEFENSE COUNSEL] CLAYTOR: Now in the event that the Court gave you instructions to the contrary, can you put that feeling aside and do exactly as the Court instructs you do to? I see you shaking your head yes Ms. Thompson.
>
> THOMPSON: (Inaudible.)

\*       \*       \*       \*       \*       \*       \*

[DEFENSE COUNSEL] DORSEY:  Now based on what you've seen in the media, and I won't [sic] you to be honest about this, okay.  I want you to think about your answers about this and be honest about this.  But based on what you've seen in the media, read in the media, read in the newspaper, seen on T.V., do you have a feeling about what happened in this case?  Ms. Thompson, you're saying you didn't.  Is that right?

THOMPSON:  Yes sir.

\*       \*       \*       \*       \*       \*       \*

[DEFENSE COUNSEL] DORSEY:  Now here's the, here's the, here's a tough question.  If the Court told you to set that opinion aside to forget about that opinion and have it not enter into your mind or into your heart, to use that word, if the Court told you to set that opinion aside, would that be a hard thing for you to let . . . ?  You could set it aside?

THOMPSON:  Yes.

\*       \*       \*       \*       \*       \*       \*

[DEFENSE COUNSEL] DORSEY:  We talked about media coverage.  Have you talked about this case with anybody?  Have you-all had conversations about this case with folks in your neighborhood or community over the course of the months that this has been going on?

THOMPSON:  (No audible response.)

[DEFENSE COUNSEL] DORSEY:  During those conversations, did those conversations lead you to come to conclusions about what you think happened?

THOMPSON:  (No audible response.)

[DEFENSE COUNSEL] DORSEY:  Ms. Thompson, you're saying yes.  You're saying yes.

THOMPSON:  Yes.

[DEFENSE COUNSEL] DORSEY:  Here again, I'm going to ask you the same question that I asked you before about media coverage, I mean, now you already answered this question.  I understand your answer.  But would those conversations that you've had combined with media and combined with everything that you know about this case, would that influence your decision?

THOMPSON:  (No audible response.)

[DEFENSE COUNSEL] DORSEY:  Could you set that aside?

THOMPSON:  (No audible response.)

[DEFENSE COUNSEL] DORSEY:  You could set it aside?  Ms. Thompson?

THOMPSON:  (No audible response.)

*       *       *       *       *       *       *

[DEFENSE COUNSEL] DORSEY:  From the witness stand.  From exhibits that are produced before you.  I want to ask you a question about your exposure to the media and exposure to the newspaper and T.V. accounts.  Let's say that you've heard all the evidence from the witness stand.  Got all the exhibits and the case is over.  Mr. Bolt's presented his case and we've presented our case and the case is over.  But there was some fact that you read about in the newspaper that was never presented to you in Court.  Never showed in Court.  Would you have a hard time setting that fact aside?  You read something in the paper that you know, well I know that this happened because I read it in the paper a million times but that never showed upon [sic] in Court.  Would you still think about that fact?  Ms. Thompson?

- 15 -

THOMPSON:  I don't think I would.

[DEFENSE COUNSEL] DORSEY:  You don't think you would?  You'd be able to set that aside?

THOMPSON:  Yeah.

*     *     *     *     *     *     *

[COMMONWEALTH'S ATTORNEY] BOLT:  Ladies and Gentlemen . . . if the Court instructs you that the defendant is presumed innocent, do you, does anybody have a problem with that concept?  That, the Court will instruct you that the defendant is presumed innocent. I'm going to ask you to respond also.  Does everyone agree with that?  Everyone nods affirmative.  Defendant's presumed innocence.  The Court, and we will assume if, if the Court instructs you that the defendant, whether he's arrested, indicted, or anything for this offense that you should not consider that.  Does anyone have any problem with putting that out of your mind and not considering it?  If the Court tells you to.

THOMPSON:  No.

*     *     *     *     *     *     *

THE COURT:  Mr. Bolt had asked you can you give a fair and impartial trial and let me just ask you.  Can you and I'll ask this to all three (3) of you, can all of you set aside any impressions that you may have received through the news media or any opinion you may have formed?  And if you become the jury and you're sworn to try the case, can you enter the jury box with an open mind and can you render a verdict based solely and only on the evidence and the law that you receive?  Can you do that?  Ms. Thompson nods yes.

"A prospective juror who is biased, prejudiced, or who

'persists in a misapprehension of law that will render him [or

- 16 -

her] incapable of abiding the court's instructions and applying the law, must be excluded for cause' because such a juror cannot be impartial." Griffin v. Commonwealth, 19 Va. App. 619, 621, 454 S.E.2d 363, 364 (1995) (quoting Sizemore v. Commonwealth, 11 Va. App. 208, 211, 397 S.E.2d 408, 410 (1990)).

> It is not uncommon to discover during voir dire that prospective jurors have preconceived notions, opinions, or misconceptions about the criminal justice system, criminal trials and procedure, or about the particular case. Even though a prospective juror may hold preconceived views, opinions, or misconceptions, the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial.

Griffin, 19 Va. App. at 621, 454 S.E.2d at 364 (citation omitted).

Cressell argues that this case is controlled by our decision in Brown, 29 Va. App. 199, 510 S.E.2d 751, and the Supreme Court's decision in Breeden, 217 Va. 297, 227 S.E.2d 734. We disagree. In Brown, the defendant sought to strike three prospective jurors for cause. The holding concerning the seating of prospective jurors one and two is relevant to our discussion. During voir dire, prospective juror one stated that she had been the victim of a violent crime. In response to questions regarding whether that experience would influence her ability to "keep an open mind" and render a decision based on the facts of the case, she expressed equivocation. She stated that she was not certain that her experience would influence her decision. We held that the juror

- 17 -

expressed "numerous reservations about her ability to serve impartially on the jury in light of her personal experiences." We noted that nearly all of the juror's responses contained the phrases, "I think," "I don't know," and "I would try." A trial judge has an opportunity to hear, observe, and assess the connotations of a juror's response; therefore, equivocal statements alone will not suffice to disqualify a juror. However, "all doubts about the fitness of a juror to serve must be resolved in favor of the accused." Brown, 29 Va. App. at 208, 510 S.E.2d at 755.

Prospective juror two in Brown, was Chief Counsel to the United States Secret Service and, stated during voir dire that "[his] whole career has been law enforcement. So [he] tend[ed] to view things from a law enforcement perspective." He stated that he might give more weight to an officer's testimony. The prospective juror also expressed his belief that it was unlikely that a case would go to trial if the accused was not guilty. We held that the juror's firmly held belief and his view toward law enforcement created "a reasonable doubt about his ability to sit impartially on a jury." The circumstances presented in Brown are readily distinguishable from the circumstance presented by juror Thompson. No evidence proved that Thompson was a victim of a violent crime, and she was unequivocal about being able to fairly render a decision in the case. Further, she did not harbor a

firmly held personal belief about law enforcement and those who are standing trial that would interfere with her being an impartial juror.

In Breeden, the defendant sought to strike a prospective juror for cause, who, during voir dire, stated that she had read about the crime in the newspaper and "was glad that person was caught." She also stated that she held the view that the defendant would have to prove his innocence. After stating those views, the Commonwealth's Attorney attempted to rehabilitate the juror, asking if she could follow the court's instructions in applying the facts to the law and follow the court's instructions regarding the presumption of innocence. She stated, "Yes sir." In holding that the trial court erred in seating the prospective juror, the Virginia Supreme Court noted that it was not "concerned with a possible misapprehension of law," stating that "[j]urors are not expected to be learned in legal maxims." Rather, the Court, considering the voir dire of the prospective juror in its entirety, found that "her response to that crucial question was not so much a symptom of her ignorance of the law as a candid reflection of the state of mind concerning [the defendant's] guilt."

Here, although Thompson initially expressed her belief that Cressell was "probably guilty of something because why would he be here at this far" and her belief that if one is present during the

commission of a crime and does nothing to intervene that person is also culpable, she subsequently stated she could set those beliefs aside if instructed to do so by the court. She expressed no equivocation in her ability to follow the court's instructions and in her ability to apply the facts to the law. Thompson also advised the court that she had not formed any preconceived opinions about Cressell's guilt or innocence based on the pretrial publicity, and she expressed no reservations regarding the defendant's presumption of innocence. Here, the attempts to rehabilitate Thompson were made largely by defense counsel, not the trial judge. But see McGill v. Commonwealth, 10 Va. App. 237, 242, 391 S.E.2d 597, 600 (1990) (holding that where a prospective juror has been shown not to be impartial, a trial judge may not rehabilitate the juror by merely asking persuasive, leading questions to which the juror acquiesces). Thompson's initial statements about an accused's innocence reflects "a symptom of her ignorance of the law," not a "reflection" of her state of mind about Cressell's guilt. The trial judge had the opportunity to observe Thompson's demeanor, to hear her responses and the connotations which she placed upon her answers, and to better form an opinion than we can on a cold record as to whether she had a fair, impartial, and open state of mind. The trial judge did not abuse his discretion in seating juror Thompson. Accordingly, we

find that the trial court did not err in refusing to strike Thompson for cause.

### C.  Sufficiency

Cressell argues that the evidence is insufficient to support his conviction.  He asserts that the Commonwealth failed to prove he was directly involved in Johnson's death.  He argues that Anderson's testimony, which was the only testimony remotely linking him to the crime, was inherently incredible and unworthy of belief.  Cressell asserts that Anderson gave contradictory testimony at trial and lied to the defense investigator.

On review of a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth, the prevailing party, and grant to it all reasonable inferences fairly deducible therefrom.  See Commonwealth v. Jenkins, 255 Va. 516, 521, 499 S.E.2d 263, 265 (1998).  "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented."  Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citations omitted).  In order for a witness' testimony to be disregarded as a matter of law, the evidence must be inherently incredible or the witness' account of the events must be so contrary to human experience as to be unworthy of belief.  See

<u>Owens v. Commonwealth</u>, 186 Va. 689, 696-97, 43 S.E.2d 895, 898 (1947).

At trial, Anderson admitted she lied to the defense investigator about whether she was in love with Ceparano, pregnant with his child, which she aborted after the murder, and whether she was afraid of him.  She stated that she lied because she "[knew] whose lawyers you were and what you was trying to pull."  Anderson also admitted she said in her statement to the defense investigator that she was unsure from whom the gas smell emanated.  However, at trial, she unequivocally stated that the gasoline smell came from Cressell.  She also gave conflicting statements and evidence concerning whether she had one drink or two during the course of the evening.

Although Anderson made several contradictory statements during trial and admitted having made statements to the defense investigator, Anderson's account of the events was not inherently incredible, and the fact finder was entitled to weigh this evidence in determining Anderson's credibility and Cressell's guilt.  <u>See</u> <u>Sandoval</u>, 20 Va. App. at 138, 455 S.E.2d at 732.  Her account of the events provides a cogent explanation for Johnson's gruesome murder and is not incredible as an explanation for what occurred.  Moreover, defense witness Harden corroborated Anderson's account of the events that transpired that evening.  Both testified that the group gathered to celebrate Harden's

birthday, all but Anderson became heavily intoxicated, either Cressell or Ceparano removed Johnson's watch, Cressell and Ceparano carried Johnson outside, and both Cressell and Ceparano were outside when Johnson was doused with gasoline and set on fire. Both witnesses testified that they smelled gasoline after the burning when Cressell and Ceparano returned to the trailer, although Harden was unable to positively attribute the odor to Cressell. Anderson's testimony that she heard Cressell threaten to burn Johnson on a white cross and call him a "nigger," although not corroborated by Harden, was not so incredible as to be unworthy of belief.

The evidence proved that Cressell, at the very least, aided and abetted in carrying Johnson outside knowing that Ceparano intended to kill Johnson and that he assisted in dousing Johnson with gasoline and in burning Johnson alive. Even if Cressell did not actually set Johnson on fire, he assisted Ceparano in the murder. See Pugliese v. Commonwealth, 16 Va. App. 82, 93-94, 428 S.E.2d 16, 25 (1993) (stating that "'proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto'"). Cressell made hostile remarks to Johnson, stating he was going to take him outside and burn him on a cross. Cressell helped Ceparano carry Johnson outside and across the

- 23 -

driveway, and he smelled of gasoline when he returned to the trailer.  Finally, in statements to the authorities, Cressell lied about his involvement in the crime.  See Rollston v. Commonwealth, 11 Va. App. 535, 548, 399 S.E.2d 823, 831 (1991) ("A defendant's false statements are probative to show he is trying to conceal his guilt, and thus are evidence of his guilt.").

For the foregoing reasons, we find that the evidence was sufficient to prove beyond a reasonable doubt that Cressell was guilty of first degree murder.  Accordingly, we affirm.

Affirmed.