COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Humphreys, Chaney and Lorish
Argued at Virginia Beach, Virginia


JAZZ KWAME GRANT

                                                     MEMORANDUM OPINION* BY
v.         Record No. 0827-21-1                      JUDGE VERNIDA R. CHANEY
                                                     AUGUST 30, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Michael A. Gaten, Judge

(Tyrone C. Johnson, on brief), for appellant.  Appellant submitting
on brief.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Jazz Kwame Grant ("Grant") appeals his felony conviction for possession of a firearm

having previously been convicted of a violent felony, in violation of Code § 18.2-308.2.

Following a jury trial in the Circuit Court for the City of Hampton ("circuit court"), Grant was

convicted and sentenced to incarceration for the mandatory minimum term of five years.  On

appeal, Grant contends that the circuit court erred in (i) overruling his objection to the admission

of a surveillance video, (ii) allowing the Commonwealth to replay for the jury a segment of

Grant's recorded police interview, (iii) striking for cause a prospective juror who acknowledged

that she might feel sympathy for Grant if the evidence showed that he had been shot, and

(iv) denying his motion for a mistrial after the jury was polled and a juror indicated that the

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

verdict was not unanimous and was not her verdict. Finding no error, this Court affirms the circuit court's judgment.

## I. BACKGROUND

On November 10, 2018, around 5:00 a.m., Detective Kyle Hinshaw of the Hampton Police Division was dispatched to the scene of a reported shooting at a house on North King Street ("the King Street house") in the City of Hampton. Detective Hinshaw discovered a deceased gunshot victim on the floor next to a table used for dice games.

Sergeant Quincina Neal ("Sgt. Neal") of the Hampton Police Division testified that the surveillance video from the King Street house shows Grant entering the house through the garage after midnight on November 10, 2018. Sgt. Neal further testified that the video shows security guards in the garage patting down Grant and removing a firearm from him before he entered the residence.

On November 10, 2018, Sgt. Neal and Detective Steven Rodey ("Detective Rodey") questioned Grant at police headquarters after Sgt. Neal informed Grant in writing about his *Miranda* rights. Grant admitted to police that he was at the King Street house in the early morning hours of November 10, 2018. Sgt. Neal reviewed the surveillance video from the King Street house with Grant. Grant identified himself in the surveillance video where a security guard removed a gun from him. Grant stated that the gun that was removed from him was a .45 caliber Glock 21.

Grant stated that after the security guard took his gun, he obtained another firearm from his friend, Eric Witherspoon ("Witherspoon"). Grant told the police that he was present when Witherspoon and another man were both shot in the "dice room" at the King Street house. Forensic evidence determined that Grant was not one of the shooters. Grant stated that he and Witherspoon both ran out of the house after the shooting. Grant identified himself in the

- 2 -

surveillance video running out of the King Street house with Witherspoon's firearm—a Taurus with an extended magazine.

Grant said that he retrieved his Glock firearm from a security guard before he drove to the hospital with Witherspoon, Nalia Booker ("Booker"), and another woman. Grant stated that they left both firearms in the car when they went into the hospital. Witherspoon died at the hospital.

A recording of Grant's police interview was played for the jury on the first day of trial. Due to technical difficulties, the circuit court recessed before the final ten-to-twelve minutes of the recorded interview was played. When the Commonwealth resumed playing Grant's recorded police interview for the jury, there was a problem with low volume. On the second day of trial, the final ten-to-twelve minutes of Grant's recorded police interview was replayed for the jury over Grant's objection. The circuit court found that when the recording was first played for the jury, the "audio quality was compromised at best, or it had some type of feedback." The circuit court informed the jury as follows:

> [A]t this time the Commonwealth is going to replay a portion of the interview that you heard yesterday so this is not new evidence, and I'll just speak for myself. Just based on maybe some of the audio issues that are just inherent in the recording with the hope that it may be enhanced so you can hear that evidence and evaluate that evidence, and the Commonwealth is just going to replay that for you at this time.

Subsequently, the recording of Grant's police interview was admitted into evidence without objection.

After Sgt. Neal testified that Grant "narrated" his firearm possession in the surveillance video during his police interview, the surveillance video was played for the jury over Grant's objection. The circuit court determined that the surveillance video accurately depicted what transpired because "the Defendant himself says, 'Yeah, that's me in the video. That's the time it

took place, that's me doing X, Y, and Z.'" When the Commonwealth played the surveillance video for the jury, Sgt. Neal pointed out the person in the video that Grant had identified as himself. Sgt. Neal also pointed out the object held by Grant that Grant had identified as Witherspoon's gun. After the surveillance video was played for the jury, it was admitted into evidence without further objection.

Detective Rodey testified that he searched Booker's car and apartment on November 10, 2018, and he found two handguns hidden in Booker's apartment. The handguns matched Grant's description of the two firearms that he had possessed at the King Street house. One of the guns was a .45 Glock handgun with blood smears on the slide and on both sides of the grip. The other gun was a Taurus Millenium .40 caliber which also had blood smears on it. Detective Rodey also found an extended magazine that fit in the Taurus firearm. Detective Rodey testified that both handguns were "made or designed to expel a projectile or bullet by means of a gaseous explosion." Both firearms were admitted into evidence without objection. Detective Rodey also found bloody clothing and blood smears in Booker's car. Later that evening when Detective Rodey and Sgt. Neal returned to execute another search warrant at Booker's apartment, they encountered Grant and took him into custody.

Two certified sentencing orders for Grant's prior felony convictions were admitted into evidence. Grant was previously convicted of possession of a firearm by a convicted felon in November 2009, in the Circuit Court for the City of Hampton, and in October 2013, in the Circuit Court for the City of Newport News.

The jury was polled at Grant's request after the foreperson informed the circuit court that the jury had reached a unanimous verdict and a verdict of guilty was read aloud by the clerk. There was no response when the clerk called Juror Shirley Ralph's name. The clerk remarked, "No Shirley Ralph? Okay." As the clerk proceeded to call the names of the remaining jurors,

the circuit court recognized some discrepancies in the clerk's juror list. The circuit court then provided the correct juror list to the clerk and advised the jury that the clerk was going to call their names again.

> So we're going to call your names, and what we need you to do is answer in the affirmative, because obviously, the jury verdict has to be unanimous. Everyone has an opportunity to fully and fairly express their views, as I previously instructed, and so we need to confirm that this is the unanimous verdict of the jury. So it's extremely important that everyone answer in the affirmative or the negative if that is not the unanimous verdict of the jury. So we're going to read the names again.

When the clerk again called the name of Juror Shirley Ralph, again there was no response. The circuit court queried, "Do we have a Ms. Ralph?" Juror Ralph raised her hand. The circuit court queried, "Ms. Ralph, is this your unanimous verdict?" Juror Ralph replied, "No." The circuit court did not accept the non-unanimous verdict.

After Juror Ralph denied that the guilty verdict was her verdict, the circuit court instructed the jury

> to deliberate to make sure everyone's views are fully and fairly expressed in whatever verdict you have. If you are at an impasse and you have some interest in retiring for the night, that is fine. We will entertain that. Just let the deputies know. But I at least want to give the jury, out of my presence, out of the Court's presence, the opportunity to fully and fairly express their views and see where it goes from there. All right. So the Court does not find the verdict is unanimous at this time. I'm going to instruct you to retire to resume your deliberations, and we'll just stand by and let us know.

Then the jury returned to the deliberation room.

Grant moved for a mistrial, and the circuit court took the motion under advisement while the jury continued its deliberations. While the jury was deliberating, the circuit court noted the following on the record:

> Here is kind of where we are as I see it. So we polled the jury the first time. There was some error on our part, but once we got the

- 5 -

names right, Ms. Ralph did not respond the first time; however, I did see her sigh, and I'll be honest with you. My first impression was that that was Ms. Ralph, because I knew I had the right list, and for whatever reason, she was wrestling with something, and upon prompting to have the jury polled again, she then still hesitated to respond but seemed to give all body language indications that the verdict was not unanimous and then confirming that orally.

Subsequently, the circuit court ruled that it was within its discretion to direct the jury to resume deliberations.

On its own motion, the circuit court polled the jury again when the jury returned a guilty verdict after further deliberations. When Juror Ralph's name was called, she affirmed the guilty verdict as her verdict without hesitation.

After all the jurors were polled, the circuit court had the following colloquy with Juror Ralph:

> THE COURT: And, Ms. Ralph, if I may, I just want to be clear as to every juror. Each juror has their right to be persuaded and find the evidence as they see it. Obviously, the verdict for guilt has to be unanimous, and previously, you indicated that that was not your unanimous verdict and so just in all candor, I have to make sure. Does the verdict of guilt -- and this is directed to Ms. Ralph. Does that reflect your unanimous verdict? Your verdict? Is that accurate?
>
> JUROR RALPH: Yes.
>
> THE COURT: All right. And do you understand that you can be persuaded by other jurors but you cannot be forced by the Court or you can't be forced by any party or any other juror to change your vote if you were otherwise convinced if you were not convinced beyond a reasonable doubt that Mr. Grant was guilty? Do you understand that?
>
> THE DEFENDANT:[1] (Nods head.)

---

[1] This reference to the defendant appears to be an error in the transcript. It appears that the circuit court was speaking to Juror Ralph, although the parties did not correct this apparent error.

THE COURT: All right. So you stand by the verdict of guilty and that you vote guilty in this case beyond a reasonable doubt?

JUROR RALPH: Yes.

THE COURT: Okay. All right.

The jury found Grant guilty as charged of possession of a firearm by a convicted felon with a prior violent felony conviction. Subsequently, the circuit court sentenced Grant to the mandatory minimum term of incarceration for five years. This appeal followed.

## II. ANALYSIS

### A. Admission of the Surveillance Video

Grant argues on appeal that the circuit court erred in admitting the surveillance video from the King Street house because it lacked foundation and was not authenticated by a custodian. On appeal, a trial court ruling regarding the admissibility of evidence is reviewed "under an abuse of discretion standard." *Davis v. Commonwealth*, 73 Va. App. 500, 507 (2021) (quoting *Thomas v. Commonwealth*, 279 Va. 131, 172 (2010)). When evaluating whether a trial court abused its discretion, the appellate court "considers only whether the record fairly supports the trial court's actions." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

The circuit court did not abuse its discretion in admitting the surveillance video because Grant himself authenticated the video as an accurate depiction of his possession of firearms at the King Street house on November 10, 2018. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. Here, Grant reviewed the surveillance video with Sgt. Neal and Grant personally identified himself and the firearms that he possessed in the video. According to Sgt. Neal's testimony, Grant's "narration" of the surveillance video included Grant's statements identifying a .45 caliber Glock 21 firearm that was removed from him in the video and a Taurus firearm with a

long magazine that he was holding in the video.  Therefore, the record fairly supports the circuit court's decision to admit the surveillance video as an accurate depiction of Grant's possession of firearms.  *See Tirado v. Commonwealth*, 296 Va. 15, 27 (2018) (Where the detective testified that the recording accurately depicted her interview with the defendant, "[n]o more evidence was needed to 'support a finding that the thing in question'—here, the recording of the interview—'is what its proponent claims' as required by Rule 2:901.").

Grant's first assignment of error also alleges that the admission of the surveillance video violated the Confrontation Clause because the custodian of the video could not be confronted and cross-examined.  Assuming without deciding that this issue was preserved for appeal, the admission of the surveillance video did not violate the Confrontation Clause because the video served as a silent witness, not as the statement of a missing or unavailable witness.  *See Bennett v. Commonwealth*, 69 Va. App. 475, 488 (2018) (holding that the appellant's Confrontation Clause argument failed where the video was admitted as a silent witness and did not include any actions that could be construed as an assertion); *see also Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992) ("Videotapes, like photographs, when properly authenticated, may be admitted . . . as 'mute,' 'silent,' or 'dumb' independent photographic witnesses." (quoting *Ferguson v. Commonwealth*, 212 Va. 745, 746, *cert. denied*, 409 U.S. 861 (1972))).

B.  Replay of Segment of Grant's Police Interview

Grant argues on appeal that the circuit court abused its discretion in allowing the Commonwealth to replay for the jury a segment of Grant's recorded police interview.  Grant alleges that this replay prejudiced him by giving undue emphasis to this portion of the Commonwealth's evidence.  However, the circuit court specifically found that when the recorded interview was first played to the jury, the "audio quality was compromised at best, or it had some type of feedback."  The circuit court accepted the Commonwealth's representation that the audio

problem had been remedied so that the replayed segment of the recording "will be more clear for the jury." Before a portion of the interview was replayed, the circuit court informed the jury that the purpose of the replay was "so you can hear that evidence and evaluate that evidence." The record shows that the purpose of the replay was not to emphasize the evidence but to ensure that the jury had an opportunity to hear and consider the evidence. Therefore, the circuit court did not abuse its discretion in allowing the replay of a segment of Grant's recorded police interview.

### C. Striking Prospective Juror for Cause

Grant argues on appeal that the circuit court erred in striking Prospective Juror Allyson Sykes ("Juror Sykes") for cause "merely because she acknowledged she might feel some sympathy towards a defendant who had been shot." "On appellate review, we give deference to the trial court's determination whether to exclude a prospective juror, because the trial court was able to see and hear each member of the venire respond to the questions posed." *DeLeon v. Commonwealth*, 38 Va. App. 409, 412 (2002) (quoting *Lovitt v. Commonwealth*, 260 Va. 497, 510 (2000), *cert. denied*, 534 U.S. 815 (2001)). "Thus, we review a trial court's decision whether to strike a prospective juror for cause for an abuse of discretion and that ruling will not be disturbed on appeal unless it appears from the record that the trial court's action constitutes manifest error." *Id.* at 412-13 (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 755 (2000)). "In conducting our review, we consider the juror's entire *voir dire*, not merely isolated statements." *Id.* at 413 (quoting *Lovitt*, 260 Va. at 510).

During *voir dire*, the prosecutor asked the prospective jurors, "Have you, a close friend or family member ever been charged or convicted with a felony?" Juror Sykes answered, "Um, my brother is a convicted felon, so –" In response to follow-up questions, Juror Sykes stated that it happened in 2005, she was not familiar with the facts and details, she did not form any opinion as to how he was treated by the police, she had no opinion as to how he was treated by the police

or by the Commonwealth, and there was nothing about that case that would prevent her from being a fair and impartial juror in the instant case.

Subsequently, the prosecutor said the following to the prospective jurors: "[D]uring the trial you may hear testimony that the Defendant was shot on the very same date that he allegedly committed this crime. Would the fact that the Defendant got shot make you feel sympathetic toward him?" Juror Sykes answered, "Yes." There was no recorded response from the other prospective jurors.

After Juror Sykes responded that she would feel sympathetic toward the Defendant if he got shot, the following question was directed at all of the prospective jurors: "Would anyone feel or believe that the Defendant's gunshot wound was punishment enough, that even if you found that he committed the crime beyond a reasonable doubt, that you would put that aside because he was the victim of a gunshot wound?" All of the prospective jurors answered, "No."

After all of the prospective jurors denied that they would consider Grant's gunshot wound to be "punishment enough," the prosecutor asked the following question about their impressions of the harshness of the mandatory minimum punishment:

> [I]f someone is convicted of possessing a firearm after being convicted of a violent felony, the law states that someone convicted of that crime must serve five years in state prison. There's no alternative sentence. It's what they call a mandatory minimum sentence. Does anyone believe that that sentence for that crime of five years is too harsh?

Some prospective jurors raised their hands. As the prosecutor verified their names, he addressed Juror Number Nineteen, "And Ms. Sykes?" Juror Number Nineteen responded, "Jenkins." The prosecutor replied, "Jenkins. I'm sorry." Juror Sykes was not identified as one of the prospective jurors who believed a five-year mandatory sentence was too harsh.

Grant's counsel addressed the prospective jurors who considered a five-year sentence too harsh and asked whether they could be fair and impartial to the Commonwealth in deciding guilt

or innocence despite their thoughts about the sentence. Grant's counsel called on several jurors by name, including Juror Sykes. Grant's counsel asked Juror Sykes, "Do you think that would affect your ability during the guilt or innocence phase?" Juror Sykes answered, "No."

Subsequently, the prosecutor moved to strike for cause all of the prospective jurors who considered the five-year mandatory minimum sentence to be too harsh. As the prosecutor listed the names of the relevant jurors, Grant's counsel added, "Sykes." The prosecutor responded, "— and Sykes, Number 18. Thank you, Mr. Johnson." Grant's counsel argued that he had rehabilitated these prospective jurors. The circuit court denied the Commonwealth's motion to strike these jurors for cause.

The Commonwealth also moved to strike Juror Sykes for cause based on her response that she would feel sympathetic toward Grant if he was shot. Grant's counsel argued that Juror Sykes' answer that the harshness of the sentence would not affect her during the guilt or innocence phase indicated that she would also not be affected by feelings of sympathy. The circuit court granted the Commonwealth's motion to strike Juror Sykes for cause based on "her answers in totality." The circuit court found that based on the "totality her responses the -- the potential for her in -- not being impartial is high. So I'm going to grant that motion to strike."

Contrary to Grant's allegation of error, the circuit court's decision to strike Juror Sykes was based on the court's consideration of the totality of Juror Sykes' answers and not merely because she acknowledged she might feel sympathy toward a defendant who had been shot. We give deference to the circuit court's decision "[b]ecause the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand . . . ." *Juniper v. Commonwealth*, 271 Va. 362, 400-01 (2006) (alterations in original) (quoting *Pope v. Commonwealth*, 234 Va. 114, 123-24, *cert. denied*, 485 U.S. 1015 (1988)). Based on the totality of Juror Sykes' *voir dire*, the circuit

court concluded that there was a high potential that Juror Sykes would not be impartial. "The partiality or impartiality of an individual juror is a factual issue best determined by the trial court." *Watkins v. Commonwealth*, 229 Va. 469, 480 (1985) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). We do not find manifest error in the circuit court's finding of a high potential that Juror Sykes would not be impartial based on the totality of her answers. Therefore, we do not find manifest error in the circuit court's decision to strike Juror Sykes for cause.

### D. Denial of Motion for Mistrial

Grant argues on appeal that the circuit court erred in denying his motion for a mistrial after Juror Shirley Ralph ("Juror Ralph") stated during the jury poll that the guilty verdict was not unanimous and was not her verdict. Grant acknowledges that this assignment of error was omitted from his statement of assignments of error filed in this Court pursuant to Rule 5A:25. However, Grant claims that this omission was inadvertent, and he asks this Court to consider the assignment of error because the issue was properly preserved in the circuit court and the Commonwealth was not prejudiced by the inadvertent omission.

The Commonwealth contends that "[c]learly, the Commonwealth, and any appellee, is prejudiced by an appellant's failure to designate an assignment of error prior to briefing." Contrary to the Commonwealth's contention, we do not find an appellant's omission of an assignment of error from its Rule 5A:25 filing to be inherently prejudicial to the appellee. The primary purpose of Rule 5A:25's requirement to designate assignments of error is to enable both parties to ensure that the record on appeal (or any required appendix) contains everything necessary for this Court's resolution of the issues raised on appeal. We find that the record on appeal includes everything necessary to enable this Court to resolve the issues raised in Grant's fourth assignment of error. We also find that the Commonwealth was not prejudiced because Grant's inadvertent omission did not hinder the Commonwealth in briefing and orally arguing

- 12 -

the issues raised in Grant's fourth assignment of error. Because the essential purpose of Rule 5A:25 was not undermined and the Commonwealth was not prejudiced by Grant's inadvertent omission of his fourth assignment of error from his designation of assignments of error, the omission does not bar this Court's consideration of Grant's fourth assignment of error. Grant's request that this Court consider his fourth assignment of error notwithstanding its omission from his Rule 5A:25 designation is hereby granted.

"On appeal, a trial court's denial of a motion for a mistrial will not be reversed 'unless there exists a manifest probability that the denial of a mistrial was prejudicial.'" *Bethea v. Commonwealth*, 68 Va. App. 487, 507 (2018) (quoting *Humbert v. Commonwealth*, 29 Va. App. 783, 792 (1999)), *aff'd*, 297 Va. 730 (2019). "When possible juror misconduct is the issue on appeal, the appellant carries the burden of establishing 'a probability of prejudice to the accused.'" *Id.* (emphasis omitted) (quoting *Jackson v. Commonwealth*, 267 Va. 178, 199 (2004)).

The circuit court did not err in denying Grant's motion for a mistrial based on a polled juror's statement that the reported guilty verdict was not her verdict. When the polling of the jury revealed that the guilty verdict was not unanimous, the circuit court was authorized to direct the jury to resume deliberations. Rule 3A:17(D) provides that "[i]f upon the poll [of the jury], all jurors do not agree, the jury may be directed to retire for further deliberations or may be discharged." Here, the circuit court instructed the non-unanimous jury

> to deliberate to make sure everyone's views are fully and fairly expressed in whatever verdict you have. If you are at an impasse and you have some interest in retiring for the night, that is fine. We will entertain that. Just let the deputies know. But I at least want to give the jury, out of my presence, out of the Court's presence, the opportunity to fully and fairly express their views and see where it goes from there. All right. So the Court does not find the verdict is unanimous at this time. I'm going to instruct you to retire to resume your deliberations, and we'll just stand by and let us know.

- 13 -

After the jury further deliberated and again returned a verdict of guilty, the circuit court polled the jury *sua sponte* and determined that the guilty verdict was unanimous. Juror Ralph verified on the record that she accepted the second guilty verdict as her verdict.

There is no manifest probability that the denial of a mistrial was prejudicial. Therefore, the circuit court's ruling denying Grant's motion for a mistrial should not be reversed.

### III. CONCLUSION

For the reasons set forth above, the circuit court's judgment is affirmed.

*Affirmed*.